1  **ORRICK, HERRINGTON & SUTCLIFFE LLP**
   DOUGLAS H. MEAL (*admitted pro hac vice*)
2  dmeal@orrick.com
   MATTHEW D. LABRIE (*admitted pro hac vice*)
3  mlabrie@orrick.com
   REBECCA HARLOW (CA BAR NO. 281931)
4  rharlow@orrick.com
   The Orrick Building
5  405 Howard Street
   San Francisco, CA  94105-2669
6  Telephone:    +1 415 773 5700
   Facsimile:    +1 415 773 5759
7
   Attorneys for Defendant
8  ZOOSK, INC.

9
                        UNITED STATES DISTRICT COURT
10
                      NORTHERN DISTRICT OF CALIFORNIA
11
                         SAN FRANCISCO DIVISION
12

13
   JUAN FLORES-MENDEZ, an individual and     Case No. 3:20-cv-4929-WHA
14 TRACEY GREENAMYER, an individual, and
   on behalf of classes of similarly situated  **DEFENDANT ZOOSK, INC.'S**
15 individuals,                                **OPPOSITION TO PLAINTIFF**
                                               **TRACEY GREENAMYER'S MOTION**
16                    Plaintiffs,              **FOR CLASS CERTIFICATION**

17         v.

18 ZOOSK, INC., a Delaware corporation,

19                    Defendant.              The Honorable William Alsup
                                              Date:      July 7, 2022
20                                            Time:      8:00 a.m.
                                              Courtroom: No. 12, 19th Floor

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .......................................................................................................... 1

II.    LEGAL STANDARD ................................................................................................... 1

III.   ARGUMENT ................................................................................................................ 2

    A.     Class Certification Must Be Denied Because Greenamyer Lacks Standing. .......... 2

        1.     Greenamyer is not a member of the classes she seeks to represent. .......... 2

        2.     Greenamyer Waived Any Right to Represent the Class or the
            Subclass. ................................................................................................... 3

    B.     The Rule 23(b)(3) Monetary Relief Subclass Cannot Be Certified. ...................... 5

        1.     Greenamyer has not established that the Subclass's damages are
            capable of measurement on a class-wide basis. ....................................... 5

            i.     Greenamyer's expert's calculations do not measure the
                Subclass's purported lost benefit of their bargain with
                Zoosk. ....................................................................................... 7

            ii.    Individualized inquiries would be required to apply
                Greenamyer's classwide damage models. .............................. 12

        2.     Individualized inquiries as to class members' standing defeats class
            certification. ............................................................................................ 14

    C.     The Rule 23(b)(2) Injunction Class Cannot Be Certified. .................................... 20

        1.     Greenamyer does not have standing to represent the Subclass in
            seeking a Rule 23(b)(2) injunction based on her UCL claim. ................... 20

        2.     Greenamyer also does not have standing to represent the Class in
            seeking a Rule 23(b)(2) injunction based on her negligence claim. ......... 22

    D.     The Rule 23(c)(4) Issue Class Should Not Be Certified. ...................................... 23

    E.     No Nation-wide Class Can be Certified. ................................................................ 24

IV.    CONCLUSION .......................................................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Adkins v. Facebook, Inc.*,
5    424 F. Supp. 3d 686 (N.D. Cal. 2019) ............................................................................. 2, 24

6 *Adkins v. Facebook, Inc.*,
   No. C 18-05982 WHA, 2019 WL 3767455
7    (N.D. Cal. Aug. 9, 2019) ...................................................................................................... 4

8 *In re Adobe Sys., Inc. Privacy Litig.*,
   66 F. Supp. 3d 1197 (N.D.Cal.2014) ............................................................................. 6, 18
9

10 *In re Anthem, Inc. Data Breach Litig.*,
   162 F. Supp. 3d 953 (N.D. Cal. 2016) ............................................................................. 6, 9
11

*AT&T Mobility LLC v. Concepcion*,
12    563 U.S. 333 (2011) ............................................................................................................. 4

13 *Backhaut v. Apple Inc.*,
   No. 14-CV-02285-LHK, 2015 WL 4776427 (N.D. Cal. Aug. 13, 2015),
14    *aff'd*, 723 F. App'x 405 (9th Cir. 2018) .......................................................................... 20

15 *Bates v. United Parcel Serv., Inc.*,
   511 F.3d 974 (9th Cir. 2007) .......................................................................................... 20, 23
16

17 *Brazil v. Dole Packaged Foods, LLC*,
   660 F. App'x 531 (9th Cir. 2016) ...................................................................................... 8
18

19 *Bruton v. Gerber Prods. Co.*,
   No. 12-CV-02412-LHK, 2018 WL 1009257 (N.D. Cal. Feb. 13, 2018) ....................... *passim*
20

*Bruton v. Gerber Prods. Co.*,
21    No. 12–2412, 2014 WL 172111 (N.D. Cal. Jan. 15, 2014) .................................................. 17

22 *Cappello v. Walmart Inc.*,
   394 F. Supp. 3d 1015 (N.D. Cal. 2019) ........................................................................... 18
23

24 *Chapman v. Pier 1 Imports (U.S.) Inc.*,
   631 F.3d 939 (9th Cir. 2011) .......................................................................................... 20

25 *City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ....................................................................................... 20, 22, 24
26

27 *Clark v. City of Lakewood*,
   259 F.3d 996 (9th Cir. 2001) .......................................................................................... 21
28

ii

*In re Clorox Litig.*,
   301 F.R.D. 436 (N.D. Cal. 2014) ........................................................................................ 20

*Cohen v. DIRECTV, Inc.*,
   178 Cal.App.4th 966 (2009) ......................................................................................... 18, 20

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ........................................................................................... 2, 5, 6, 15

*Garter ex rel. D.C. v. Cnty. of San Diego*,
   783 F. App'x 766 (9th Cir. 2019) ....................................................................................... 24

*Davis v. O'Melveny & Myers*,
   485 F.3d 1066 (9th Cir. 2007) ............................................................................................. 2

*dotStrategy, Co. v. Facebook, Inc.*,
   No. 20-00170 WHA, 2021 WL 2550391 (N.D. Cal. June 22, 2021) .............................. 18, 20

*Ehret v. Uber Technologies, Inc.*,
   148 F. Supp. 3d at 899 ....................................................................................................... 19

*Frenzel v. AliphCom*,
   76 F. Supp. 3d 999 (N.D. Cal. 2014) ................................................................................. 25

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) ......................................................................................................... 2, 3

*George v. eBay, Inc.*,
   71 Cal. App. 5th 620 (2021) ................................................................................................. 4

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ............................................................................. 24

*Greenstein v. Noblr Reciprocal Exch.*,
   No. 21-CV-04537-JSW, 2022 WL 472183 (N.D. Cal. Feb. 15, 2022) ................................ 23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ............................................................................................................. 2

*In re iPhone Application Litig.*,
   6 F. Supp. 3d 1004 (N.D. Cal. 2013) ................................................................................. 17

*Korea Supply Co. v. Lockheed Martin Corp.*,
   63 P.3d 937 (Cal. 2003) ....................................................................................................... 7

*Krueger v. Wyeth*,
   No. 03CV2496-JAH-MDD, 2016 WL 3981125 (S.D. Cal. Apr. 4, 2016) ........................... 29

*In re LinkedIn User Privacy Litig.*,
   2014 WL 1323713 (N.D. Cal. Mar. 28, 2014) ..................................................................... 6

iii

*In re LinkedIn User Privacy Litig.*,
  932 F. Supp. 2d 1089 (N.D.Cal.2013) ..................................................................... 17

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
  No. 19-MD-2879, 2022 WL 1323139 (D. Md. May 3, 2022) ................................ 6, 9

*Morris v. Redwood Empire Bancorp*,
  128 Cal. App. 4th 1305 (2005) ................................................................................ 4

*Nedlloyd Lines B.V. v. Super. Ct.*,
  3 Cal. 4th 459 (1992) ............................................................................................ 26

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) .............................................................................................. 20

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ........................................................................... *passim*

*Opperman v. Path, Inc.*,
  No. 13-CV-00453-JST, 2016 WL 3844326 (N.D. Cal. July 15, 2016) ................... 25

*Perkins v. LinkedIn Corp.*,
  53 F. Supp. 3d 1190 (N.D. Cal. 2014) .................................................................. 17

*Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*,
  55 Cal. 4th 223 (2012) ............................................................................................ 4

*In re POM Wonderful LLC*,
  No. ML 10-02199 DDP RZX, 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ......... 9

*Quackenbush v. Am. Honda Motor Co.*,
  No. C 20-05599 WHA, 2022 U.S. Dist. LEXIS 76631
  (N.D. Cal. Apr. 27, 2022) ....................................................................................... 2

*Rahman v. Mott's LLP*,
  693 F. App'x 578 (9th Cir. 2017) .......................................................................... 24

*Reitman v. Champion Petfoods USA, Inc.*,
  830 F. App'x 880 (9th Cir. 2020) ................................................................... 6, 8, 24

*Rodman v. Safeway, Inc.*,
  No. 11-CV-03003-JST, 2014 WL 988992 (N.D. Cal. Mar. 10, 2014), *aff'd*, 694
  F. App'x 612 (9th Cir. 2017) ...................................................................... 16, 17, 19

*Rodriguez v. Instagram, LLC*,
  No. C 12-06482 WHA, 2013 WL 3732883 (N.D. Cal. July 15, 2013) ................... 24

*Sadiq v. Metro. Coffee Co.*,
  No. 21-CV-00747-JST, 2021 ................................................................................. 18

*Sanchez v. Valencia Holding Co.*,
    61 Cal. 4th 899 (2015) ........................................................................................ 4

*Schlesinger v. Reservists Comm. to Stop the War*,
    418 U.S. 208 (1974) ........................................................................................... 2

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ........................................................................................... 1

*Simpson v. Pulte Home Corp.*,
    No. C 11-5376 2012 WL 1604840 (N.D. Cal. May 7, 2012) ........................... 5

*Smith v. Keurig Green Mountain, Inc.*,
    No. 18-CV-06690-HSG, 2020 WL 5630051 (N.D. Cal. Sept. 21, 2020) .......... 7, 10

*In re Sony Gaming Networks & Consumer Data Sec. Breach Litig.*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012) .............................................................. 25

*Svenson v. Google Inc.*,
    No. 13-CV-04080-BLF, 2015 WL 1503429 (N.D. Cal. Apr. 1, 2015) ............... 18

*In re Tobacco Cases II*,
    240 Cal. App. 4th 779 (2015) ............................................................................ 8

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ....................................................................................... 6, 19

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ....................................................................................... 14, 20

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ........................................................................................... 2, 5

*In re Vioxx Class Cases*,
    180 Cal. App. 4th 116 (2009) ............................................................................ 6

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................... 1, 2, 5

*Walker v. Life Ins. Co.*,
    953 F.3d 624 (9th Cir. 2020) ............................................................................. 18

*Webb v. Carter's Inc.*,
    272 F.R.D. 489 (C.D. Cal. 2011) ...................................................................... 14, 15

*Williams v. Apple, Inc.*,
    449 F. Supp. 3d 892 (N.D. Cal. 2020) .............................................................. 17

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ......... 17

v

1

**Statutes**

2

Cal. Bus. & Prof. Code § 22576 ................................................................................. 18

3

Fed. R. Civ. P. 23 ............................................................................................. *passim*

4

Fed. R. Civ. P. 23(a) ................................................................................. 1, 2, 3, 5

5

Fed. R. Civ. P. 23(b)(2) ...................................................................................... *passim*

6

Fed. R. Civ. P. 23(b)(3) ...................................................................................... *passim*

7

Fed. R. Civ. P. 23(c)(4) ............................................................................. 1, 23, 24

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   INTRODUCTION

This class action arises from a third-party criminal cyber-attack that Zoosk, an on-line dating site, suffered in January 2020 (the "Intrusion"). ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ The putative class (the "Class") consists of those Zoosk members whose information was compromised in the Intrusion.  Tracey Greenamyer ("Greenamyer"), one of the two surviving named plaintiffs in the case, now files a "Notice" (ECF 200) and "Motion" (ECF 200.1) to have a subclass of the Class (consisting of Class members who purchased Zoosk subscriptions) (the "Subclass") certified under Rule 23(b)(3) as to one of the two surviving claims in the case (the UCL claim).[2]  In addition, Greenamyer seeks certification as to the entire Class of a Rule 23(b)(2) injunction-only class and a Rule 23(c)(4) issues-only class.  For the many independently sufficient reasons stated below, Greenamyer's proposed classes cannot be certified.

## II.   LEGAL STANDARD

"Rule 23 provides a procedural mechanism for 'a federal court to adjudicate claims of multiple parties at once, instead of in separate suits.'"  *Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) ("*Olean*") (quoting *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 408 (2010)).

"To take advantage of Rule 23's procedure for aggregating claims, plaintiffs must make two showings.  ***First***, the plaintiffs must establish 'there are questions of law or fact common to the class,' as well as demonstrate numerosity, typicality and adequacy of representation."  *Id*. (quoting Fed. R. Civ. P. 23(a)) (emphasis added).  "A common question 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  *Id*. (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  "By contrast, an individual question is one

---

[1] *See* Declaration of Juliana von Trotha ("von Trotha Decl.") ¶ 9 (detailing what Zoosk members and member data were and were not involved in the Intrusion).

[2] For the convenience of the Court, the convoluted procedural history that led to the narrowing of the claims, proposed class representatives, and putative classes involved in this case is recapitulated in the Declaration of Douglas H. Meal ("Meal Dec.") ¶¶ 2-18.

1

where members of a proposed class will need to present evidence that varies from member to member." *Id.* (*citing Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). **Second**, the "plaintiffs must show that the class fits into one of three categories" set forth in Rule 23(b). *Id.*

"Before it can certify a class, a district court must be 'satisfied, after a rigorous analysis, that the prerequisites' of both Rule 23(a) and [23(b)] have been satisfied.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Rule 23 "does not set forth a mere pleading standard"; instead, a plaintiff "must affirmatively demonstrate his compliance." *Dukes*, 564 U.S. at 350. Each prong must be "satisf[ied] through evidentiary proof." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Accordingly, plaintiffs wishing to proceed through a class action must actually "prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence," *Olean*, 31 F.4th at 665, and must do so "before class certification," *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275–76 (2014). Plaintiffs may "not simply plead[] that their proposed class satisfies each requirement of Rule 23" as is permitted at the motion to dismiss stage. *Olean*, 31 F.4th at 664.

## III.  ARGUMENT

### A.  Class Certification Must Be Denied Because Greenamyer Lacks Standing.

#### 1.  *Greenamyer is not a member of the classes she seeks to represent.*

"To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, [s]he must possess the same interest and suffer the same injury shared by all members of the class [s]he represents." *Quackenbush v. Am. Honda Motor Co.*, No. C 20-05599 WHA, 2022 U.S. Dist. LEXIS 76631, at *3 (N.D. Cal. Apr. 27, 2022) (Alsup, J.) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974) (treating class membership by a putative class representative as a standing issue)); *see Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 696 (N.D. Cal. 2019) (plaintiff who did not pay for credit monitoring had no standing to represent a class seeking to recover credit monitoring costs). "Courts sometimes have referred to a plaintiff's class membership as an 'implicit requirement[]' of class representation." *Quackenbush*, 2022 U.S. Dist. LEXIS 76631 at *3 (quoting William B. Rubenstein, 1 Newberg on

1  Class Actions §§ 3:8-3:10 (5th ed. database updated Dec. 2021)).[3]

2  Here, the Class and the Subclass are each limited, *inter alia*, to individuals "whose PII was

3  compromised in the [Intrusion]."  Notice at 1.  Greenamyer, however, has put forth no proof that

4  any of her information was compromised in the Intrusion.  Such proof should have been easy to

5  produce, if Greenamyer were indeed a member of her proposed classes, because as reported by

6  Zoosk in its regulatory filings announcing the Intrusion, all individuals whose information was

7  compromised in the Intrusion were sent an email by Zoosk so informing them.  von Trotha Decl. ¶

8  13.  Greenamyer testified, however, that *she* never received any notification from Zoosk that her

9  information was involved in the Intrusion,[4] and unlike her co-plaintiff Flores-Mendez, she produced

10  no such notification email from Zoosk in response to Zoosk's discovery requests.  *See* Meal Decl.

11  ¶ 25.  Indeed,

12

13  *See* Greenamyer's Responses to Zoosk Interrogatory 4, **Exh.**

14  **B**; *see also* Greenamyer Depo., **Exh. A**.[5]  And Zoosk's own records reflect that none of the

15  information Greenamyer provided to Zoosk was compromised in the Intrusion and that, as a result,

16  Zoosk never sent her any notification of the Intrusion.  von Trotha Decl. ¶ 15.

17  In short, the record evidence overwhelmingly establishes that Greenamyer is not a member

18  of the classes she seeks to represent.  That being the case, she does not have standing (nor does she

19  meet the Rule 23(a) adequacy and typicality requirements) to represent either the Class or the

20  Subclass.   And, as Greenamyer is the only named plaintiff seeking to represent those proposed

21  classes, neither the Class nor the Subclass may be certified on any of the theories she advances.

22  **2.**     ***Greenamyer Waived Any Right to Represent the Class or the Subclass.***

23  Zoosk's September 7, 2016 Terms of Use ("TOU"), which Greenamyer acknowledges

---

[3] Regardless of the lens by which a court views the issue, as the Supreme Court "ha[s] repeatedly
held[,] a class representative must be part of the class and possess the same interest and suffer the
same injury as the class members."  *Falcon*, 457 U.S. at 156.

[4] Greenamyer Depo., **Exh. A** at 52:20-54:19

[5] Unless stated otherwise, all references to exhibits are to exhibits attached to the Meal Declaration.

3

1   having agreed to, *see* Plaintiffs' Fourth Amended Class Action Complaint ("Complaint") ¶¶ 37, 44,

2   contains a class action waiver, which requires that any claim be "brought in the parties' individual

3   capacity" and prohibits "any purported class action, collective action, private attorney general

4   action or other representative proceeding."   TOU, **Exh. F**. ¶ 20.c.   The waiver is valid and

5   enforceable unless the provision is procedurally and substantively unconscionable, *Davis v.*

6   *O'Melveny & Myers*, 485 F.3d 1066, 1072 (9th Cir. 2007), which it is not.

7          "Although adhesion contracts often are procedurally oppressive, this is not always the case.

8   Oppression refers not only to an absence of power to negotiate the terms of a contract, but also to

9   the absence of reasonable market alternatives." *Adkins v. Facebook, Inc.*, No. C 18-05982 WHA,

10  2019 WL 3767455, at *2 (N.D. Cal. Aug. 9, 2019) (Alsup, J); *see also AT&T Mobility LLC v.*

11  *Concepcion*, 563 U.S. 333, 346–47 (2011) ("[T]he times in which consumer contracts were

12  anything other than adhesive are long past.").   Where, "'the challenged term is in a contract

13  concerning a nonessential recreational activity'"—which online dating certainly is—plaintiffs

14  "'always ha[ve] the option of simply forgoing the activity.'"  *Adkins*, 2019 WL 3767455, at *2

15  (internal quotation omitted)); *see also George v. eBay, Inc.*, 71 Cal. App. 5th 620, 632 (2021)

16  (finding no unconscionability where "appellants do not allege they were unable to avoid eBay's

17  allegedly unconscionable policies by, for example, selling on other online marketplaces").   The

18  TOU's class-action-waiver provision is therefore not procedurally unconscionable.

19         Nor is that provision substantively unconscionable.   "Substantive unconscionability

20  pertains to the fairness of an agreement's actual terms and to assessments of whether they are overly

21  harsh or one-sided." *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 55 Cal. 4th

22  223, 246 (2012).   An imbalanced benefit does not necessarily render a term unconscionable.

23  "Rather, the term must be so one-sided as to shock the conscience," *id.* (internal quotations

24  omitted), "hence the various intensifiers in [California courts'] formulations: '*overly* harsh,'

25  '*unduly* oppressive,' '*unreasonably* favorable,'" *Sanchez v. Valencia Holding Co.*, 61 Cal. 4th 899,

26  911 (2015) (emphasis original).   Such is not the case here, and the Supreme Court has rejected the

27  argument that a provision is unconscionable for making an individual action less financially

28  attractive than a class action.  *See Concepcion*, 563 U.S. at 347 (reasoning that prior rule requiring

4

1  damages "be predictably small" was "toothless and malleable" and rule requiring "the consumer

2  allege a scheme to cheat consumers" had "no limiting effect"); *Simpson v. Pulte Home Corp.*, No.

3  C 11-5376 SBA, 2012 WL 1604840, at *5 (N.D. Cal. May 7, 2012) (rejecting, in reliance on

4  *Concepcion*, plaintiffs' argument that "litigating their claims on an individual basis is much less

5  financially attractive than if they were permitted to do so on a class basis" made a class action

6  waiver unconscionable).  Plaintiff thus has no basis to avoid the application of the TOU's class

7  action waiver provision and is precluded from acting as a class representative in this action.

8  **B.      The Rule 23(b)(3) Monetary Relief Subclass Cannot Be Certified.**

9          "The requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a): the

10  plaintiffs must prove that there are 'questions of law or fact common to class members' that can be

11  determined in one stroke, [*see Wal-Mart*, 564 U.S. at 349], in order to prove that such common

12  questions predominate over individualized ones, [*see Tyson Foods*, 577 U.S. at 453–54]."  *Olean*,

13  31 F.4th at 663-64.  To certify a class under Rule 23(b)(3), "the district court must find that 'the

14  questions of law or fact common to class members predominate over any questions affecting only

15  individual members, and that a class action is superior to other available methods for fairly and

16  efficiently adjudicating the controversy.'"  *Id.* at 663-64 (quoting Fed. R. Civ. P. 23(b)(3)).  "The

17  predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more

18  prevalent or important than the non-common, aggregation-defeating, individual issues."  *Tyson*

19  *Foods*, 577 U.S. at 453 (cleaned up).  As shown below, the Subclass fails these requirements.

20      **1.      *Greenamyer has not established that the Subclass's damages are capable of***

21              ***measurement on a class-wide basis.***

22          To satisfy the Rule 23(b)(3) predominance requirement, the plaintiff must prove by a

23  preponderance of the evidence that "damages are capable of measurement on a classwide basis"

24  *i.e.*, via a common, classwide method rather than by means of individualized inquiries as to the

25  damages suffered by each class member.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)).

26  Additionally, the plaintiff "must present a damages model that is 'consistent with [her] liability

27  case.'"  *Bruton v. Gerber Prods*. Co., No. 12-CV-02412-LHK, 2018 WL 1009257, at *8 (N.D. Cal.

28  Feb. 13, 2018) (quoting *Comcast*, 569 U.S. at 34).  Here, then, in addition to putting forward a

5

1    model that calculates the Subclass's damages via a common, classwide method, in order to satisfy

2    Rule 23(b)(3) Greenamyer must also show that her model only measures "those damages

3    attributable to the theory [of liability]" being advanced.  *See Comcast*, 569 U.S. at 35.

4         The sole "theory of liability" being advanced by Greenamyer in seeking a Rule 23(b)(3)

5    certification as to the Subclass is her UCL claim.  Mot. at 11.  And the sole monetary recovery

6    available to a plaintiff who brings a UCL claim is restitution.  *See In re Tobacco II Cases*, 46 Cal.

7    4th 298, 312 (2009) ("[U]nder the UCL, prevailing plaintiffs are generally limited to injunctive

8    relief and restitution." (citation and quotation marks omitted)).  For UCL purposes, where as a result

9    of the defendant's alleged UCL violation the amount the plaintiff paid for the defendant's product

10   or service ("X") exceeded the value the plaintiff actually received from that product or service

11   ("Y"), the difference between X and Y has been held to be recoverable "restitutionary damages"

12   on a "benefit of the bargain" theory of recovery.  *See, e.g.*, *Reitman v. Champion Petfoods USA,

13   Inc*., 830 F. App'x 880, 881 (9th Cir. 2020); *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131

14   (2009).  "[C]ase law within the data breach context confirms that [such] benefit of the bargain

15   damages represent economic injury for purposes of the UCL."  *In re Anthem, Inc. Data Breach

16   Litig*., 162 F. Supp. 3d 953, 985 (N.D. Cal. 2016) (citing *In re Adobe Sys., Inc. Privacy Litig*., 66

17   F. Supp. 3d 1197, 1224 (N.D. Cal. 2014); *In re LinkedIn User Privacy Litig*., 2014 WL 1323713,

18   *4 (N.D. Cal. Mar. 28, 2014)).  In the data breach context, the theory of benefit of the bargain

19   restitutionary damages is that the defendant's UCL violation denied the plaintiff data security to

20   which she was entitled and thus allows the plaintiff to recover restitutionary damages equal to the

21   difference between the amount she paid for data security and the value of the data security she

22   actually received.  *See In re Anthem, Inc. Data Breach Litig*., 162 F. Supp. 3d 953, 985 (N.D. Cal.

23   2016); *see also In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., No. 19-MD-2879, 2022

24   WL 1323139, at *2 (D. Md. May 3, 2022)  ("[O]verpayment damages" are "the difference between

25   what the class plaintiffs actually paid for a... hotel room, and the price that [defendant] would have

26   been able to charge in a hypothetical 'but-for' world in which consumer willingness to pay for a...

27   room had shifted in response to... knowledge of [defendant's] inadequate data security.").

28        Here, Greenamyer's UCL claim seeks "benefit of the bargain" damages of this sort.  Feb.

1    2022 Order (ECF 133) at 4 (Plaintiff "argues for standing via a 'benefit-of-the-bargain' theory of

2    economic damages under Section 17200.").    Thus, in order for Greenamyer to meet the

3    predominance requirement of Rule 23(b)(3) as to the Subclass, she must prove by a preponderance

4    of the evidence that her proffered damages model is capable of measuring on a classwide basis the

5    Subclass's purported benefit of the bargain damages.  That means she must prove her model can

6    measure on a class-wide basis the difference between the value of the data security Zoosk allegedly

7    promised to provide for the Subclass's compromised data and the value of the data security Zoosk

8    actually provided for that data.  As set forth below, she has made no such showing.

9            **i.    *Greenamyer's expert's calculations do not measure the Subclass's purported***

10                 ***lost benefit of their bargain with Zoosk.***

11           Greenamyer's expert Mr. Olsen presents three alternative calculations of the damages

12   allegedly suffered by the Subclass as a result of Zoosk's alleged UCL violation.  Each calculation

13   method is fundamentally flawed, because each employs a calculation model that ignores the

14   applicable measure of "benefit of the bargain" restitutionary damages under the UCL—namely the

15   difference between (1) what the Subclass members paid for their subscriptions and (2) the value

16   they actually received in exchange for their subscription payments.  Instead, rather than attempting

17   to calculate *the value the Subclass lost* by reason of Zoosk's alleged UCL violation, Mr. Olsen's

18   models all look to *Zoosk's supposed gains* from that violation.  As a result, "[Greenamyer]'s

19   proposed models are most accurately described as nonrestitutionary disgorgement, which is an

20   improper method of calculating restitution as a matter of law."  *Smith v. Keurig Green Mountain*,

21   *Inc*., No. 18-CV-06690-HSG, 2020 WL 5630051, at *8 (N.D. Cal. Sept. 21, 2020) (citing *Korea*

22   *Supply Co. v. Lockheed Martin Corp*., 63 P.3d 937, 944 (Cal. 2003) (differentiating restitutionary

23   disgorgement from nonrestitutionary disgorgement, which is the "surrender of all profits earned as

24   a result of an unfair business practice regardless of whether those profits represent money taken

25   directly from persons who were victims of the unfair practice") (internal citation omitted)).  As

26   described below, damage calculation models like Mr. Olsen's are routinely found inadequate by

27   courts examining motions for class certification under the UCL.

28           ***Calculation 1.***  Greenamyer admits Mr. Olsen's "Calculation 1" "rests on the premise that

                                                      7

Plaintiff and the [rest of the Subclass] are entitled to a return of all subscription fees as damages." Mot. at 21:7-8.  On its face, then, Calculation 1 is a full-refund model.  "[A] full refund [of the cost of a product] *may* be available [to plaintiff if she] prove[s] the product [received] had *no* value to [her]."  *Reitman*, 830 F. App'x at 882 (rejecting full refund model) (emphasis original) (quoting *In re Tobacco Cases II*, 240 Cal. App. 4th 779 (2015)).  Greenamyer, however, puts forth no proof whatsoever that the Subclass's Zoosk subscriptions had no value whatsoever to them.  Nor could she have done so, as she admitted in her deposition that *she herself* got substantial value from her Zoosk subscriptions (which she renewed on several occasions), and as it is perfectly obvious that whatever security features Zoosk allegedly promised but did not provide to its subscribers did not represent the entirety of the value of their subscriptions, given all the features of a Zoosk subscription that had nothing to do with data security.[6]  Calculation 1 is thus not a model by which to measure restitutionary benefit of the bargain UCL damages—*i.e.*, a model that measures the difference between the value of what was promised and the value of what was received—but instead is a model that seeks to calculate non-restitutionary disgorgement of Zoosk revenues.  Ellman Rpt. ¶¶ 17-24.  As such, the Court cannot find Calculation 1 to be a valid model for a classwide calculation of the Subclass's alleged benefit of the bargain losses from Zoosk's alleged UCL violation.[7]  *See Reitman*, 830 F. App'x at 882; *Brazil v. Dole Packaged Foods*, LLC, 660 F. App'x 531, 535 (9th Cir. 2016) (rejecting full refund damages model in UCL action because plaintiffs did not prove consumers received no benefit from the purchased product); *Bruton*, 2018 WL 1009257, at *9 (same); *In re POM Wonderful LL*C, No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *3

---

[6] Ms. Greenamyer testified that the value she received from her Zoosk subscription included, *inter alia*, ███████████████████████████████ (Greenamyer Depo., **Exh. A** at 34:14-18). ███████████████████████████████ (*id.* at 29:3-15); and ███████████████████████████ (*id. at* 31:2-8).   Ms. Greenamyer also testified that ███████████████████████████████████████████████████████████ *Id.* at 50:19-21; 37:6-13.

[7] As Zoosk's expert Mr. Brian Ellman explains, ███████████████████████
███████████████████████████████████████████████████████████████
███████████████ Ellman Rpt., **Exh. D** at ¶ 3.

1  (C.D. Cal. Mar. 25, 2014) (same).[8]  Accordingly, Calculation 1 is of no help to Greenamyer's effort

2  to meet Rule 23(b)(3)'s predominance requirement as to the Subclass.[9, 10]

3       *Calculation 2.*  Calculation 2 fails even more egregiously than Calculation 1 to provide a

4  model by which to measure on a classwide basis the Subclass's purported benefit of the bargain

5  losses from Zoosk's alleged UCL violation.  Calculation 2 purports to employ a model for

6  calculating  Zoosk's profits from the subscription revenues it received from the Subclass.  Mot. at

7  21:10 ("Calculation 2 computes profits derived…."); Ellman Rpt., **Exh. D** at ¶¶ 25-27.  As such,

8  Calculation 2 is wholly untethered from the applicable measure of "benefit of the bargain"

9  restitutionary damages under the UCL, as it does not even purport to calculate *either* (i) the value

10  of the services the Subclass members actually received in exchange for their subscription payments

11  *or* (ii) the value of the services Zoosk promised to provide in exchange for those payments.  In

12  other words, the Calculation 2 model ignores *both* elements of the applicable measure of damages.

13  ────────────────────

14  [8] The court in *In re POM Wonderful LLC*, succinctly explains the rationale behind courts' rejection
of the full refund model for UCL restitution:  "Plaintiffs do not cite, nor is the court aware of, any

15  authority for the proposition that a plaintiff seeking restitution may retain some unexpected boon,
yet obtain the windfall of a full refund and profit from a restitutionary award.  Nor can [p]laintiffs

16  plausibly contend that they did not receive any value at all from [d]efendant's products…. The
question is not whether a plaintiff received the particular benefit he sought or what the value of that

17  benefit was or would have been[,]" rather it is a measure of "benefits conferred upon [p]laintiffs[.]"
No. ML 10-02199 DDP RZX, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014)

18  [9] In his Report, Mr. Ellman noted that,

19  

20  Ellman Rpt., **Exh. D** at ¶ 19, n.22.
*Id.*

21  *See,*

22  *e.g., In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. at 986.

23  Olsen Reply Rpt., **Exh. E** at ¶¶ 10-13.

24  Mr. Olsen's correction, however, does not
change the fact that the definition of the Subclass remains facially overbroad:  As defined, the

25  Subclass includes subscribers who purchased Zoosk subscriptions before 2015 and subscribers who
were refunded,

26  [10] Compare, for example, Mr. Olsen's model with the plaintiff's experts' model in *In re Marriott*:
There, unlike here, the experts' model sought to take into account the value actually received by

27  the class members from the defendant by calculating the price the defendant would have been able
to charge the class members for its product in a but-for world where the class members knew of the

28  defendant's alleged data security failings.  2022 WL 1396522, at *2.  Thus, the experts concluded,
the amount of "overpayment" was not the full price of a hotel room.  *See id.* at *27 n.58.

That being the case, the Calculation 2 model is not a valid methodology for a classwide calculation of restitutionary benefit of the bargain UCL damages and thus cannot assist Greenamyer in meeting the Rule 23(b)(3)'s predominance requirement as to the Subclass. *See, e.g.*, *Smith*, 2020 WL 5630051, at *8 (rejecting the plaintiff's proposed "gross margin model" as an appropriate UCL remedy because it "calculate[d] a value equal to all profits (generally calculated by subtracting the cost of goods sold from their price" and constituted "nonrestitutionary disgorgement… an improper method of calculating restitution as a matter of law").[11]

> ***Calculation 3.***   Calculation 3, like Calculations 1 and 2, similarly fails to present a valid model for calculating on a classwide basis the Subclass's purported benefit of the bargain losses from Zoosk's alleged UCL violation, as on its face it makes no effort to calculate the difference between the value of the services the Subclass bargained for and the value of the services the Subclass actually received. Ellman Rpt., **<u>Exh. D</u>** at ¶ 30.  Again, Mr. Olsen explains this calculation is based on Zoosk's purported benefit (*e.g.*, profit) from its alleged UCL violation, not the Subclass's purported benefit-of-the-bargain losses from that supposed violation:  He claims "Zoosk inappropriately benefitted by earning more profits than it otherwise would have due to its failure to use the profits it generated from the [Subclass] to adequately protect the PII in its possession." Olsen Rpt., Plaintiff's **<u>Exh. I</u>** at ¶ 19.  And Greenamyer claims—without explanation—that the Subclass is entitled to that amount.  Mot. at 21:22-23.  Because Calculation 3 is designed to calculate nonrestitutionary disgorgement of profits earned by Zoosk as a result of its supposed UCL violation, and not restitutionary disgorgement of the value that the Subclass failed to receive by reason of that alleged violation, the Calculation 3 model does not calculate the Subclass's purported benefit of the bargain losses from Zoosk's alleged UCL violation and thus offers no help to Greenamyer in meeting Rule 23(b)(3)'s predominance requirement as to the Subclass.[12]

---

[11] To the extent the premise of the Calculation 2 model is that the profits Zoosk achieved from the services it *did provide* to the Subclass members are equal to the value of the services Zoosk allegedly *did not provide* to those members, that premise is not stated in or anywhere supported by Mr. Olsen's report and is in any event absurd on its face as it would necessarily imply that Zoosk made zero profit on the substantial services it indisputably *did provide* to the Subclass.

[12] To the extent the premise of the Calculation 3 model is that the profits Zoosk supposedly achieved from the data security services it allegedly failed to provide to the Subclass members are equal to the value the Subclass supposedly lost from Zoosk's alleged non-provision of those services, that

1    Furthermore, even if the Subclass's purported benefit of the bargain losses from Zoosk's

2    alleged UCL violation could be validly calculated by the profits Zoosk supposedly made from the

3    data security it allegedly promised, but failed, to provide for the information of the Subclass

4    members that was compromised in the Intrusion, the Calculation 3 model is not a valid method for

5    calculating those profits.  Mr. Olsen asserts that, in his expert opinion,

6

7        Olsen Reply Rpt., **Exh. E** at ¶ 13, Table 3.

8

9

10

11   *Id.*; Olsen Rpt., Plaintiff's **Exh. I** at ¶¶ 22-23.  But in point of fact, the record is rife with evidence

12   that Zoosk made substantial data security expenditures between 2015 and 2020.  For example, Mr.

13   Hoskins, Zoosk's former Chief Technology Officer, testified in his deposition that Zoosk indeed

14   spent "north of 15 percent" of its Research & Development budget on data security,

15                                                      13

16

17

18

19

20   _____

21   premise (1) is not stated in or anywhere supported by Mr. Olsen's report; (2)

22                                                      , *see* Ellman Rpt., **Exh. D** at ¶ 30; and (3) is at odds with
     the welter of case law, cited above, that rejects efforts to prove restitutionary benefit of the bargain
23   UCL damages by proving the profits the defendant earned by means of its alleged UCL violation.

24   13 Hoskins Depo., Plaintiff's **Exh. E** 154:7-19 ("Q:  Well, was – was the information security
     system being properly and adequately funded at the time of the breaches?  A:  Yeah. I mean, it's
25   tough to determine what 'adequately' means.  I mean, it really is difficult.  Even within the data
     industry, there is massively different levels of risk.  Q:  So funding should be commensurate with
26   risk to eliminate it or reduce it?  A:  Well, I can say it like – I can't remember the exact details, but
     if you looked at all of our security spend, it must have been north of 15 percent of the total budget.");
27   155:6-10 ("Q:  In January of 2020, how much of the budget at Zoosk was allocated to information
     security?  A:  Like I said to you before, depending on how you count it, it could be roundabout 10
28   or 15 percent, maybe more.").

1 ███████████████████████████████████  *See* Zoosk's Second Amended Response to Plaintiffs'

2 Interrogatory No. 4, **Exh. C**.  Thus, even if the theory underlying Calculation 3 were an acceptable

3 methodology for calculating the Subclass's purported benefit of the bargain losses from Zoosk's

4 alleged UCL violation, the Category 3 model still would not assist Greenamyer in proving the

5 Subclass's UCL damages on a classwide basis and thereby meeting Rule 23(b)(3)'s predominance

6 requirement, because the Category 3 model takes no account of Zoosk's actual data security spend

7 during the period in question and thus on its face cannot provide a valid calculation of Zoosk's

8 supposed profits from failing to provide data security measures it allegedly should have provided

9 during that period for the Subclass member data that was compromised in the Intrusion.

10      **ii.    *Individualized inquiries would be required to apply Greenamyer's classwide***

11              ***damage models.***

12      Even if one of Mr. Olsen's proffered damages models were theoretically valid (which is not

13 the case because all three of Mr. Olsen's models employ an incorrect measure of damages), those

14 models still would not assist Greenamyer in meeting Rule 23(b)(3)'s predominance requirement

15 because an individualized inquiry would be necessary in order to apply all three models.

16      For example, as Mr. Olsen reinforces in his Reply Report, **Exh. E** ¶ 14, ████████████

17 ████████████████████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████████████████

19 █████████████████████████████  In order to apply the model underpinning Calculations 1 and 2, then,

20 one must determine if, in fact, each and every Subclass member would not have bought his or her

21 subscription had he or she known of Zoosk's alleged misrepresentation.  Such determination is not

22 possible by classwide proof.  Instead, the only way to make this determination to conduct a

23 member-by-member inquiry of every Subclass member.

24      Moreover, there is no reason to think that the individualized inquiry necessary to apply Mr.

25 Olsen's model would sustain Mr. Olsen's assumption that each and every Subclass member would

26 not have purchased his or her subscription had he or she known of Zoosk's alleged

27 misrepresentation. ████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████  *See* Ellman Rpt., **Exh. D** at ¶¶

22, 23, 38

*Id.*

Olsen Reply Rpt., **Exh. E** at ¶ 15.

This literature thus demonstrates that the model underpinning Mr. Olsen's Calculations 1 and 2 cannot properly be applied by simply assuming each and every Subclass member would never have become a Zoosk subscriber had he or she known of Zoosk's alleged misrepresentation.  Instead, the only way to apply that model would be to make a member-by-member inquiry as to how, if at all, knowledge of Zoosk's alleged misrepresentation would have affected each Subclass member's decision to purchase a Zoosk subscription.  Thus, even if the model underpinning Calculations 1 and 2 were based on the correct measure of restitutionary benefit-of-the-bargain UCL damages (which it is not, as the model fails to take into account the substantial actual value that all Subclass members received in exchange for their subscription payments, whether or not they would have purchased their subscriptions had they been aware of Zoosk's alleged misrepresentation), that model would not assist Greenamyer in satisfying Rule 23(b)(3)'s predominance requirement as it would still necessitate the very sort of individualized inquiries that defeat predominance.

Similarly, although the model underpinning Calculation 3 does not make the same unvalidated assumption as does the model Calculations 1 and 2 (that no consumer would have become a Zoosk subscriber had she known of Zoosk's purported misrepresentation), the Calculation 3 model makes a different unvalidated assumption: that Zoosk's supposedly avoided data security costs apply equally to each Subclass member.  Based on this assumption, the Category 3 model assumes that no individual analysis would be required in order to determine what amount of data security costs Zoosk purportedly avoided as to each individual Subclass member.  That assumption is utter nonsense.  Subclass members had subscriptions that covered different periods of time and paid different prices for those subscriptions.  Zoosk's supposedly avoided data security costs likewise would necessarily vary over time.  Given those variances, the only way to apply the model that underpins Calculation 3 would be to make a member-by-member inquiry that calculated

what amount of data security costs Zoosk avoided as to each Subclass member, based on such variables (to name a few) as when each Subclass member's subscription was operative, how much he or she paid for the subscription, what other Subclass members' subscriptions were operative at the same time and how much they paid for their subscriptions, and what data security costs Zoosk avoided during the operative period of the Subclass member's subscription.  Thus, even if the model underpinning Calculation 3 were based on the correct measure of restitutionary benefit-of-the-bargain UCL damages (which it is not, as it is predicated on the profits Zoosk supposedly achieved, rather than the value the Subclass supposedly lost, as a result of Zoosk's supposed UCL violation), that model would not assist Greenamyer in satisfying Rule 23(b)(3)'s predominance requirement as it would still necessitate the very sort of individualized inquiries that defeat predominance.

## 2. *Individualized inquiries as to class members' standing defeats class certification.*

Because "'[e]very class member must have Article III standing in order to recover individual damages,' Rule 23… requires a district court to determine whether individualized inquiries into this standing issue would predominate over common questions."  *Olean*, 31 F.4th at 668 n.12 (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)).[14]  Likewise, to certify a UCL class, "[the plaintiff] must show that unnamed class members suffered some injury in fact that gives them standing to bring a UCL claim," so predominance likewise cannot be established under Rule 23(b)(3) as to a UCL claim where individualized inquiries would be required to determine if members of a putative UCL class suffered an injury sufficient to create UCL standing.  *Webb v. Carter's Inc.*, 272 F.R.D. 489, 503 (C.D. Cal. 2011).

Here, Greenamyer (and the Court) have been crystal clear that alleged Zoosk misrepresentations are the basis for Greenamyer's sole surviving theory of UCL liability, which is

---

[14] While *Olean* in a footnote overruled *Mazza's* (666 F.3d 581) *categorical* rule that "no class may be certified that contains members lacking Article III standing," 31 F.4th at 682 n.32, the *Olean* court explained that, while Rule 23 does not categorically *preclude* a district court from certifying a class that has "more than a de minimis number of uninjured class members," if after "a rigorous analysis" the district court determines that "individualized questions relate[d] to the injury status of class members… predominate over common questions," the class may not be certified.  *Id.*

1   predicated on the UCL's "unfair" prong.[15]   That being the case, her and the Subclass's theory of

2   UCL injury necessarily must be predicated on those very same alleged Zoosk misrepresentations—

3   otherwise Greenamyer would run afoul of *Comcast's* mandate that the plaintiff "must present a

4   damages model that is 'consistent with [her] liability case.'" *Bruton*, 2018 WL 1009257, at *8

5   (quoting *Comcast*, 569 U.S. at 35).

6        Where, as here, the "plaintiff's [UCL liability] theory [is based on misrepresentations], this

7   would require a showing of actual reliance" on the purported misrepresentations by each absent

8   member of the class in order to establish such class member's Article III and UCL standing.  *See*

9   *Webb*, 272 F.R.D. at 503.  Thus, even if a "[d]efendant's liability [for misrepresentations under the

10   unfair prong of the UCL] may be subject to common proof, [w]hether individual class members

11   are entitled to recover on the basis of that liability is not." *Id*.  Here, in order to demonstrate Article

12   III and UCL standing as to the Subclass, each Subclass member must be shown to have relied on

13   the purported misrepresentation contained in Zoosk's Privacy Policy when choosing to purchase

14   her subscription.  Such showing necessarily requires individualized inquiries that will predominate

15   over any possible common questions, precluding a Rule 23(b)(3) certification of the Subclass.

16        None of the counterarguments advanced by Greenamyer holds water.  It is true that the

17   Court previously ruled at the motion-to-dismiss stage that *Greenamyer herself* had sufficiently

18   *alleged* that she relied on the purported misrepresentation contained in Zoosk's Privacy Policy in

19   deciding to purchase her Zoosk subscription.  ECF 133 at 5.  But at the class certification stage, it

20   is not sufficent for Greenamyer to merely *allege* that the Subclass members all relied on that

21   purported misrepresentation; rather, Greenamyer must "prove… the prerequisites of Rule 23 are

22   satisfied by a preponderance of the evidence."  *Olean*, 31 F.4th at 665.  The Court's motion-to-

23   dismiss ruling makes no finding on *that* issue.

24        Equally unavailing is Greenamyer's argument that the Subclass members' *reliance* on the

25   purported misrepresentation in Zoosk's Privacy Policy can be established by merely proving that

26   the Subclass members all confirmed they "read and consent[ed]" to the Privacy Policy by the act

27

28   [15] *See* Compl. ¶ 105 ("Defendant engaged in business acts or practices deemed "unfair" under the UCL because, as alleged above, Defendant failed to disclose the inadequate nature of the security of its computer systems and networks…."); *see also* February 2022 Order (ECF 133) at 4-12.

DEFENDANT'S OPP. TO PLAINTIFF'S MOT. FOR CLASS CERTIFICATION
4:20-CV-4929-WHA

1   of subscribing to Zoosk's services.  Just because a Subclass member *read and understood* Zoosk's

2   purported misrepresentation does not mean that he or she *relied* on that misrepresentation in

3   deciding to purchase a Zoosk subscription.  Greenamyer's own testimony confirms this point.  She

4   testified that ███████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████[16]  Given that individualized inquiry of Greenamyer proved that—

7   despite her having read the document—she neither "relied on Zoosk's alleged misrepresentation[]"

8   nor "considered [the alleged misrepresentation] in purchasing Zoosk's service," *see* ECF 93 at 5,

9   common proof that the Subclass members as a group all *read and understood* the Privacy Policy

10  would in no way obviate the need for individual inquiry as to whether they *relied on* the Privacy

11  Policy's alleged misrepresentation in deciding to purchase their Zoosk subscriptions.

12        Indeed, under this Court's precedents, the Subclass members' acknowledgments would not

13  be sufficient even to prove that they *actually read* the Zoosk misrepresentation in question (much

14  less that they relied on it).  As stated by Judge Tigar of this Court in a ruling that the Ninth Circuit

15  subsequently affirmed, "click[ing] the box" that indicates a putative class member read and

16  consented to a company's terms of use is not sufficient proof and "does nothing to salvage…

17  statutory claims [of a putative class under the misrepresentation prong of the UCL], which require

18  proof of actual reliance, or at least proof that the [p]roposed [c]lass [m]embers actually viewed the

19  challenged misrepresentation." *Rodman v. Safeway, Inc.*, No. 11-CV-03003-JST, 2014 WL

20  988992, at \*11 (N.D. Cal. Mar. 10, 2014), *aff'd*, 694 F. App'x 612 (9th Cir. 2017) (denying

21  certification of a UCL misrepresentation claim because, *inter alia*, plaintiff "failed to demonstrate

22  that the common issues [would] predominate over individualized issues relating to the merits of his

23  statutory [UCL] claims."); *see In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-

24  02752-LHK, 2017 WL 3727318, at \*27 (N.D. Cal. Aug. 30, 2017) ("According to Plaintiffs, they

25  have adequately alleged reliance on Defendants' Privacy Policy because they had to accept

26  Defendants' Terms of Service (*i.e.*, TOU) to create their accounts.  Defendants contend, however,

27  ───────────────────────────
[16] Greenamyer Depo., **Exh. A** at 50:12-17 ████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████

1    that Plaintiffs have not adequately alleged actual reliance for purposes of their fraudulent prong

2    claim because Plaintiffs do not allege that they actually read the Privacy Policy.  The Court agrees

3    with Defendants.  This Court has consistently held that plaintiffs in misrepresentation cases must

4    allege that they actually read the challenged representations.").  Here, then, notwithstanding the

5    acknowledgments that they all provided, individualized inquiry would be required of the Subclass

6    members even to prove that they *actually* read the alleged Zoosk misrepresentation on which their

7    UCL claim is founded, as they must have done in order to have standing to pursue that claim.[17]

8            Greenamyer next argues that the Subclass members need not prove reliance on the Privacy

9    Policy's alleged misrepresentation because they are trying to hold Zoosk liable for that supposed

10   misrepresentation on a breach-of-contract theory.  While "that is a potentially viable contractual

11   argument[, *i.e.*, contract law recognizes that… a contracting party need not show that she

12   subjectively read and relied on each term of the contract to enforce a particular term[,]" *Rodman*,

13   2014 WL 988992 at *11, as this Court has previously ruled Greenamyer's UCL claim *is not* based

14   on any alleged breach of contract; it is based on a purported misrepresentation.  *See* ECF 133 at

15   8:25-27 ("[T]he… complaint adequately alleges a violation of Section 17200 as to… misleading

16   statements[.]") and 9:16 ("Breach of contract does not, however, support [Plaintiffs'] argument for

17   unfairness.").  Indeed, Greenamyer's 26-page, 111-paragraph Complaint never once alleges even

18   the existence, much less any breach, of a contract between Zoosk and her.  Instead, it is replete with

19   allegations of misrepresentations that Zoosk directed towards her.  *See, e.g.*, Compl. ¶¶ 35-44, 105.

20   As the very cases Plaintiff relies on in the Motion make clear, "*[w]hen the alleged unfair

21   competition is premised on a defendant's misrepresentation*, a plaintiff must allege [s]he actually

22   relief on that misrepresentation to have standing under the UCL."  *Cappello v. Walmart Inc*., 394

---

[17] *See, e.g.*, *Perkins v. LinkedIn Corp*., 53 F. Supp. 3d 1190, 1220 (N.D. Cal. 2014) ("To make the reliance showing, this Court has consistently held that plaintiffs in misrepresentation cases must allege that they actually read the challenged representations."; *Bruton v. Gerber Prods. Co*., No. 12–2412, 2014 WL 172111, at *9 (N.D. Cal. Jan. 15, 2014) (holding that a plaintiff may not "assert claims based on statements she did not view"); *In re iPhone Application Litig*., 6 F. Supp. 3d 1004, 1015, (N.D. Cal. 2013) ("Plaintiffs must have seen the misrepresentations and taken some action based on what they saw—that is, Plaintiffs must have actually relied on the misrepresentations to have been harmed by them."); *see also In re LinkedIn User Privacy Litig*., 932 F. Supp. 2d 1089, 1093 (N.D.Cal.2013) (dismissing case because "Plaintiffs do not even allege that they actually read the alleged misrepresentation"); *Williams v. Apple, Inc*., 449 F. Supp. 3d 892, 913 (N.D. Cal. 2020).

F. Supp. 3d 1015, 1020 (N.D. Cal. 2019) (emphasis added); *see Svenson v. Google Inc*., 2015 WL 1503429, at *9 (N.D. Cal. Apr. 1, 2015) ("A consumer's burden of pleading causation in a UCL action should hinge on the nature of the alleged wrongdoing[.]").  Because she seeks to certify a UCL claim that asserts liability based on an alleged misrepresentation, Greenamyer may not rely on a breach-of-contract theory to avoid the requirement that all Subclass members be shown to have actually read and relied on Zoosk's purported misrepresentation.[18]

As a last resort, Greenamyer notes that *in certain scenarios*, plaintiffs bringing a claim under the UCL unfairness (or fraudulent) prong are entitled to a presumption of reliance. "To establish a reliance presumption, the operative question has become whether the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them." *dotStrategy, Co. v. Facebook, Inc*., No. 20-00170 WHA, 2021 WL 2550391, at *6 (N.D. Cal. June 22, 2021) (Alsup, J.) (citing *Walker v. Life Ins. Co*., 953 F.3d 624, 631 (9th Cir. 2020) (It is undisputed that "Section 17200 [the UCL] does not authorize an award for injuctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice." (citing *Cohen v. DIRECTV, Inc*., 178 Cal. App. 4th 966, 980 (2009)); *see Sadiq v. Metro. Coffee Co*., No. 21-CV-00747-JST, 2021 WL 4499234, at *1 (N.D. Cal. July 12, 2021) (A plaintiff "could not have relied on Terms and Conditions that he did not review[.]"). Accordingly, this presumption "is only available where the entire class saw the misrepresentations or was exposed to a pervasive long-term advertising campaign[,]" such as the decades-long advertising campaign launched by the defendant cigarette manufacturers in *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009).  *See Rodman*, 2014 WL 988992, at *11 (N.D. Cal. Mar. 10, 2014), *aff'd*, 694 F. App'x 612 (9th Cir. 2017); *see Ehret*, 148 F. Supp. 3d at 899 (presumption only available if there is evidence that it is "highly likely that each member of the putative class was exposed to the same misrepresentations") (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 298 (2009)).

---

[18] For this reason, the cases Plaintiff cites in the Motion in order to dodge her obligation to prove the absent putative class members read and relied on the purported misrepresentation are inapposite. *See Svenson*, 2015 WL 1503429, at *9 (UCL claim premised on breach of contract and violation of Cal. Bus. & Prof. Code § 22576, neither of which require a showing of reliance); *In re Adobe Sys., Inc. Privacy Litig*., 66 F. Supp. 3d at 1227 (same, pleading standard applied).

1    Here, Plaintiff has alleged no such massive, pervasive, misleading advertising campaign

2    that resulted in it being "highly likely" that each putative class member saw the purported

3    misrepresentation and, thus, entitled Plaintiff to the presumption of reliance.  Plaintiff has only

4    alleged that Zoosk made a misrepresentation in its Privacy Policy.  Plaintiff has put forth no

5    evidence whatsoever to prove by a preponderance of the evidence that all, many, or even some of

6    the absent putative class members actually read Zoosk's Privacy Policy.  Indeed, data suggest that

7    only a miniscule fraction of visitors to Zoosk's webpages review the Privacy Policy:  Of the █████

8    ██████ individual page visits to Zoosk webpages over a seven-day period, only ██████ of those

9    visits were to the Zoosk Privacy Policy webpage.  von Trotha Decl. ¶ 18; *see Rodman*, 2014 WL

10   988992, at \*11 *aff'd*, 694 F. App'x 612 (9th Cir. 2017) ("[T]he fact that less than five percent of

11   Safeway.com registrants actually clicked through to view the Special Terms is likely to be fatal to

12   most of the Proposed Class Members' statutory claims.").  Similar claims have been found lacking

13   by this Court in *Ehret v. Uber Technologies, Inc*.  There, Judge Chen found it was not "highly

14   likely" that most of the putative class had been exposed to Uber's purported misrepresentations

15   when they appeared only on Uber's website and not on its mobile application, noting that "[j]ust

16   because the information was available on the website does not necessarily imply that visitors would

17   likely have seen it, especially when there was a good deal of other information on the website [and

18   especially where the purported misrepresentation] was not highlighted or especially set off to

19   ensure that visitors would see it[.]"  *Ehret*, 148 F. Supp. 3d at 900-01.[19]

20   Moreover, even in cases where a presumption of reliance *is* available, that presumption is

21   rebuttable.  *See, e.g*., *Krueger v. Wyeth, Inc*., No. 03CV2496-JAH-MDD, 2016 WL 3981125, at \*8

22   (S.D. Cal. Apr. 4, 2016).  Thus, were a presumption of reliance applicable here, the burden of

23

24   [19] In multiple other cases in which plaintiffs provided far more evidence of possible exposure to
     misleading statements, this Court and other California courts nevertheless found plaintiffs had
25   provided "no evidence" to show that it was "highly likely" that all members of the putative class
     saw the allegedly misleading statements.  *See, e.g*., *In re Clorox Litig.*, 301 F.R.D. 436 (N.D. Cal.
26   2014) (plaintiffs alleged misleading statement in a television commercial ad that ran for sixteen
     months); *Cohen*, 178 Cal. App. 4th 966 (2009) (plaintiffs alleged misleading statement in a print
27   advertising and promotional materials); *dotStrategy, Co. v. Facebook, Inc*., No. 20-00170 WHA,
     2021 WL 2550391, at \*10 (N.D. Cal. June 22, 2021) (Alsup, J.) (finding defendant did not
28   "affirmatively present[]" the webpages containing alleged misleading statements).

19

1    persuasion on the reliance issue would shift from Greenamyer to Zoosk, but the need for an

2    individualized inquiry to resolve that issue as to any given Subclass member would still exist.  Thus,

3    even if Greenamyer had a valid basis for claiming a presumption of reliance here (which she does

4    not), that would in no way assist her in satisfying the Rule 23(b)(3) predominance requirement.

5             **C.    The Rule 23(b)(2) Injunction Class Cannot Be Certified.**

6             "A Rule 23(b)(2) class can only be certified if the named plaintiff shows that she herself is

7    subject to a likelihood of future injury."  *Bruton*, 2018 WL 1009257, at *5.  To make this showing,

8    the plaintiff must demonstrate that "[s]he has suffered or is threatened with a 'concrete and

9    particularized' legal harm," *Bates v. United Parcel Serv., Inc*., 511 F.3d 974, 985 (9th Cir. 2007)

10   (citation omitted), that "is sufficiently imminent and substantial," *TransUnion LLC v. Ramirez*, 141

11   S.Ct. 2190 (2021), coupled with "a sufficient likelihood that [s]he will again be wronged in a similar

12   way," *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also Chapman v. Pier 1 Imports*

13   *(U.S.) Inc*., 631 F.3d 939, 946 (9th Cir. 2011) (en banc).  A plaintiff must establish a "real and

14   immediate threat of repeated injury."  *Bates*, 511 F.3d at 985 (citation omitted). The alleged threat

15   cannot be "conjectural" or "hypothetical."  *Lyons*, 461 U.S. at 101–02. Thus, "[p]ast exposure to

16   illegal conduct does not in itself show a present case or controversy regarding injunctive relief... if

17   unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488,

18   495–96 (1974).  "In addition, the claimed threat of injury must be likely to be redressed by the

19   prospective injunctive relief."  *Bates*, 511 F.3d at 985–86.[20]

20            **1.    *Greenamyer does not have standing to represent the Subclass in seeking a Rule***

21                    ***23(b)(2) injunction based on her UCL claim.***

22            For three separate reasons, Greenamyer has failed to establish that she has standing to

23   represent the Subclass in seeking a 23(b)(2) injunction based on her UCL claim.

24            **First**, because Greenamyer is not a member of the Subclass because none of her data was

25

26   ───────────────
     [20] "This [23(b)(2) standing] requirement is separate from the minimum threshold requirements for
27   Article III standing to bring a damages claim[.]"  *Backhaut v. Apple Inc*., 2015 WL 4776427, at *8
     n.5 (N.D. Cal. Aug. 13, 2015), *aff'd*, 723 F. App'x 405 (9th Cir. 2018) (citing *Clark v. City of*
28   *Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) ("A determination that a plaintiff has standing to
     seek damages does not ensure that the plaintiff can also seek injunctive or declaratory relief.")).

1  involved in the Intrusion, she lacks standing to represent the Subclass in seeking injunctive relief

2  on her UCL claim for the same reasons that she lacks standing to represent the Subclass in seeking

3  monetary relief on that claim.  *See* Section III.A.1 *supra*.

4      **Second**, Greenamyer has not proven and cannot prove that the Subclass members face any

5  threat of repeated injury traceable to Zoosk's alleged UCL violation.  The UCL injury that the

6  Subclass members supposedly incurred is "overpayment" for data security services due to and in

7  reliance on Zoosk's purported misrepresentation in its Privacy Policy concerning the data security

8  it would provide for the data compromised in the Intrusion.  That injury cannot be repeated in the

9  future because Zoosk's currently operative Privacy Policy no longer contains the language Plaintiff

10 claims was misleading.  *See Bruton*, 2018 WL 1009257, at *6 (N.D. Cal. Feb. 13, 2018).  As it is

11 now impossible for any Subclass member to suffer the injury on which the UCL claim is based, no

12 basis exists for imposing a Rule 23(b)(2) injunction to protect against a recurrence of that injury.[21]

13     **Third**, "Rule 23(b)(2) class can only be certified if the named plaintiff shows that she herself

14 is subject to a likelihood of future injury."  *Bruton,* 2018 WL 1009257, at *5.  Here, because

15 Plaintiff has admitted that she is not a Zoosk subscriber and does not intend ever again to be a

16 Zoosk subscriber,[22] there is no likelihood that she will ever again overpay for data security services

17 in paying the purchase price of a Zoosk subscription.  As Greenamyer thus cannot show that she

18 herself has a likelihood of a future injury of the sort that forms the basis for her UCL claim, a Rule

19 23(b)(2) class cannot be certified naming her as the class representative on that claim.

20

21 _____

22 [21] Here, *Bruton*, 2018 WL 1009257, at *6 (N.D. Cal. Feb. 13, 2018) is instructive.  In *Bruton*, the
   plaintiff brought a UCL claim under the unlawful prong, claiming that the defendant's products

23 were mislabeled and misleading.  The defendant, however, had stopped using the alleged
   misleading labels a year before the suit was filed, and products with alleged misleading labels could

24 no longer be purchased.  Thus, the Court found, the plaintiff had no standing to seek injunctive
   relief via a Rule 23(b)(2) class because (1) the alleged mislabeling had ceased and (2) therefore the

25 plaintiff could no longer purchase the product in reliance on a misleading label.  As the court
   concluded "where, as here [and, as here], the business has ceased the offending practice on its

26 own… there is nothing left to enjoin."  *Id.*
   [22] Greenamyer Depo. **Exh. A** at 31:9-13 ▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ████████████████████████████████████████████████████

28

2.       *Greenamyer also does not have standing to represent the Class in seeking a Rule 23(b)(2) injunction based on her negligence claim.*

Similarly, Greenamyer has failed to establish that she has standing to represent the Class in seeking a 23(b)(2) injunction based on her negligence claim.

*First*, again, because Greenamyer is not a member of the Class because none of her data was not involved in the Intrusion, she has no standing to represent the Class in seeking any relief based on her negligence claim.  *See* Section III.A.1 *supra*.

*Second*, a "Rule 23(b)(2) class can only be certified if the named plaintiff shows that she herself is subject to a likelihood of future injury." *Bruton,* 2018 WL 1009257, at *5.  Here, Greenamyer has admitted that ███████████████████████████████ Greenamyer's Responses to Zoosk Interrogatory 14, **Exh. B**; *see also* Greenamyer Depo., **Exh. A** at 16:11-12[23], and consistent with that admission she has neither claimed nor provided any proof of any harm that she suffered by reason of Zoosk's purported negligence or by reason of the Intrusion.  Having suffered no harm from the Intrusion or the alleged Zoosk negligence that supposedly caused the Intrusion, it therefore necessarily follows that Greenamyer has failed to prove—and is legally and logically unable to prove—that she faces an "imminent and substantial" risk of future harm from data security failings on Zoosk's part.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (affirming dismissal of claim for injunctive relief because no "sufficient likelihood that [plaintiff[ will again be wronged in a similar way").  That being the case, Greenamyer has no standing to represent the Class in seeking a 23(b)(2) injunction based on her negligence claim.

*Third,* a Rule 23(b)(2) class based on Greenamyer's negligence claim could only be certified here if the Class's requested injunctive relief would likely redress the Class's claimed threat of future injury from data security failings on Zoosk's part.  *See Bates*, 511 F.3d at 986 ("[T]he claimed threat of injury must be likely to be redressed by the prospective injunctive relief.").  Here, the Rule 23(b)(2) injunctive relief Greenamyer seeks, *see* Mot. at 16:7-20, would

---

[23] Greenamyer Depo., **Exh. A** at 61:14-22 ████████████
████████████████████████████████████████████████████

do nothing to redress whatever risk the Class may have of future harm from Zoosk security failings, because all of the "security controls" recommended by Greenamyer's retained expert either already have been or are being implemented by Zoosk or would provide no incremental security benefit given other security controls Zoosk already has in place.  *See* Declaration of Constantin Garcev ¶ 4-16.  In circumstances such as these, where the requested injunctive relief will have no material effect on the prevention of alleged future harm and where plaintiffs have not demonstrated that the defendant has *repeatedly* caused the very same harm in the past, courts find plaintiffs have no standing to seek injunctive relief and decline to certify a Rule 23(b)(2) class.  *See, e.g.*, *Greenstein v. Noblr Reciprocal Exch.*, 2022 WL 472183, at *8 (N.D. Cal. Feb. 15, 2022) (dismissing request for injunctive relief where "[i]njunctive or declaratory relief would not be able to redress any future harm of identity theft or fraud because… [defendant] already took immediate action to remedy its unintentional disclosure by changing its policies and masking [PII] in the page source code.").

### D.    The Rule 23(c)(4) Issue Class Should Not Be Certified.

Again, because none of Greenamyer's data was involved in the Intrusion, she is not a member of the Class and has no standing to represent a 23(c)(4) issue class.  Section III.A.1 *supra*.

Greenamyer seeks certification of a nationwide issue class under Rule 23(c)(4) as to the issues of duty and breach of duty raised by her negligence claim.  The Rule states that "*[w]hen appropriate*, an action may be brought or maintained as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4) (emphasis added).  Such certification "is 'appropriate' only if it 'materially advances the disposition of the litigation as a whole.'"  *Rahman v. Mott's LLP*, 693 F. App'x 578, 579 (9th Cir. 2017) (citation omitted).  The issue class that Greenamyer seeks to certify here would provide no such material advances, as it would leave significant individualized liability issues—most crucially, the issues of injury and causation of injury—that because they could not be resolved on a classwide basis, would require not millions of mini-trials to determine liability.  In a case like this "where the determination of liability itself requires an individualized inquiry," issue certification should be denied.  *Adkins*, 424 F. Supp. 3d at 697 (Alsup, J.) (citation omitted).[24]

---

[24] The Ninth Circuit similarly affirmed a refusal to certify an issue class in *Reitman*, after concluding that while "predominance is not required" for a Rule 23(c)(4) issue class, "numerous

1    So too here, given the individual liability and damages issues that would be left unresolved

2    by the Rule 23(c)(4) certification sought by Greenamyer.[25]

3        **E.    No Nation-wide Class Can be Certified.**

4        As this Court has recognized, Greenamyer may not seek to certify a nation-wide class

5    premised on her UCL claim absent a binding choice of law provision that selects California law as

6    governing any dispute related to provision of Zoosk's services.[26]  *See* ECF 141 at 10:6-20;

7    *Rodriguez v. Instagram, LLC*, No. C 12-06482 WHA, 2013 WL 3732883, at *3 (N.D. Cal. July 15,

8    2013) (Alsup, J.) ("Courts routinely deny class certification because plaintiff's claims would require

9    application of the substantive law of multiple states.") (internal citation and quotation marks

10   omitted); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1027 (N.D. Cal.

11   2007) (Alsup, J.) (striking references to nationwide class in plaintiffs' complaint as plaintiffs failed

12   to "show[] that California ha[d] a greater interest in applying [the UCL] than other states" had in

13   applying their own unfair-competition laws to the conduct at issue).  The same logic applies to

14   Greenamyer's attempt to certify a nation-wide class premised on her negligence claim:  Absent a

15   choice-of-law provision that makes California law govern any dispute related to provision of

16   Zoosk's services, such a nation-wide class cannot be certified because Greenamyer has not made

17   and cannot make a showing that California has a greater interest in applying its negligence laws

18   than other states have to apply their own negligence laws to the conduct at issue.

19       It is Greenamyer's burden to show that a choice of law provision allows her to seek

20   certification of nationwide classes on her UCL and negligence claims.  *See Opperman v. Path, Inc.*,

21   _____

22   individualized issues affecting determinations of liability make Rule 23(c)(4) inefficient."
     *Reitman*, 830 F. App'x at 882.

23   [25] Indeed, the individualized damages inquiries that would be required to resolve the Class's
     negligence claims in and of themselves counsel against certification of the Rule 23(c)(4) class

24   sought by Greenamyer.  In *Garter ex rel. D.C. v. Cnty. of San Diego*, 783 F. App'x 766 (9th Cir.
     2019), the Ninth Circuit affirmed a trial court's refusal to certify an issue class as to the defendant's

25   liability because it determined that the court was acting "within the bounds of its discretion" when
     it concluded that the party seeking certification had "failed to show that damages could be

26   efficiently calculated on a classwide basis following success in the liability phase of the litigation."
     *Id.* at 767–68.  As such, certification "would not significantly advance the resolution of the class

27   claims" and denial was reasonable.  *Id.*

28   [26] As discussed, *see* Section III.A.1 *supra*, Greenamyer has no standing to represent any class,
     nationwide, California-wide, or otherwise.

                                                    24

No. 13-CV-00453-JST, 2016 WL 3844326, at *7 (N.D. Cal. July 15, 2016).  Greenamyer has not met that burden.  Her only reference to a choice of law provision is to one that appears in the TOU.  Mot. at 20 n.23.  Even making the generous and unsubstantiated assumption that the TOU's choice of law provision applies not only to Greenamyer but to every member of the Class, regardless of when he or she became a Zoosk member, that provision states only that "[t]his Agreement shall be governed by the internal substantive laws of the State of California, without respect to its conflict of laws principles."  By its own express terms, then, the provision does not extend the choice of California law to any dispute that may arise in conjunction with the services provided by Zoosk (such as the negligence and UCL claims advanced here by Greenamyer); instead, the choice of California law is limited to the interpretation and construction of the TOU themselves.  This provision is materially identical to the provision determined by the Southern District in *In re Sony Gaming Networks & Consumer Data Sec. Breach Litig.* to "[b]y its own terms" to "dictate[] only that California law applies to the construction and interpretation of the contract, and… does not apply to plaintiffs' noncontractual claims asserted under California's consumer protection statutes." 903 F. Supp. 2d 942, 964-65 (S.D. Cal. 2012); *see Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014) (holding that choice of law provision that governed the plaintiff's use of the defendant's website did not extend to claims related to plaintiff's use of defendant's products).[27] So too here:  Because the choice of law provision in the TOU is limited to the construction and interpretation of the TOU themselves and thus does not extend to issues that do not require construction or interpretation of those TOU, Greenamyer may not rely on that provision to shoehorn into any class certified in this action claims of Class members who are not California residents.  In no event, then, may a nation-wide class be certified as to either of Greenamyer's claims.

## IV.    CONCLUSION

For the foregoing reasons, Zoosk respectfully requests that the Court deny Plaintiff's Motion for Class Certification and dismiss the action.

---

[27] Admittedly, California law is unsettled here.  *See, e.g.*, *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459 (1992).  The facts and circumstances in *In re Sony*, however, are so similar to the facts and circumstances here as to warrant application of the same rule established in that case.

25

1    Dated: June 10, 2022                          Respectfully submitted,

2                                                  **ORRICK, HERRINGTON & SUTCLIFFE LLP**

3

4                                                  By:         */s/ Douglas H. Meal*
5                                                              DOUGLAS H. MEAL
                                                             Attorneys for Defendant
6                                                                 Zoosk, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28