**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley, Esq. (SBN 174156)
Kiley L. Grombacher, Esq. (SBN 245960)
Lirit A. King, Esq.  (SBN 252521)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile:   (805) 270-7589
E-Mail: mbradley@bradleygrombacher.com
         kgrombacher@bradleygrombacher.com
         lking@bradleygrombacher.com

*Attorneys for Plaintiffs*

(Additional counsel listed below)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| JUAN FLORES-MENDEZ, an individual and AMBER COLLINS, an individual, and TRACY GREENAMYER, an individual, on behalf of classes of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>ZOOSK, INC., a Delaware corporation,<br><br>Defendant. | **CASE NO: 3:20-cv-04929-WHA**<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:   July 7, 2022<br>Time:   8:00 AM<br>Court:  Courtroom 12, 19th Floor<br>         Hon. William Alsup |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................................ 1

II.    ARGUMENT ...................................................................................................................... 2

        A.     Plaintiff Greenamyer Has Standing ......................................................................... 2

              1.     The Record Establishes Greenamyer's Inclusion in the Class .................... 2

              2.     Zoosk Waived Enforcement of Any Class Action Waiver Clause ............. 5

        B.     The Court Should Certify a Rule 23(B)(3) Class ..................................................... 6

              1.     Plaintiff's Damages Models are Proper ....................................................... 6

              2.     Individual Reliance Issues Do Not Prelude Certification ......................... 12

        C.     The Court Should Certify Rule 23(b)(2) ................................................................ 13

        D.     Certification under Rule 23(c)(4) Would Be Appropriate .................................... 13

        E.     A Nationwide Class Can be Certified .................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Hyland's Inc.*,
　　300 F.R.D. 643 (C.D. Cal. 2014). ................................................................................... 15

*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*,
　　191 Cal.App.3d 1341, 235 Cal.Rptr. 228 (1987) ............................................................. 6

*Capaci v. Sports Rsch. Corp.*,
　　2022 WL 1133818 (C.D. Cal. Apr. 14, 2022) .................................................................. 9

*Clay v. CytoSport, Inc.*,
　　2018 WL 4283032 (S.D. Cal. Sept. 7, 2018) ................................................................. 15

*Comcast Corp. v. Behrend*,
　　569 U.S. 27 (2013) ......................................................................................................... 10

*Dickey v. Advanced Micro Devices, Inc.*,
　　2016 WL 6427852  (N.D. Cal. Oct. 31, 2016) ............................................................... 15

*Frenzel v. AliphCom*,
　　76 F. Supp. 3d 999 (N.D. Cal. 2014) ............................................................................. 16

*In re Anthem, Inc. Data Breach Litig.*,
　　162 F. Supp. 3d 953 (N.D. Cal. 2016) ........................................................................... 10

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
　　2022 WL 1396522 (D. Md. May 3, 2022); ............................................................. 10, 14

*In re Pom Wonderful LLC*,
　　2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ................................................................. 7

*Keilholtz v. Lennox Hearth Prod. Inc.*,
　　268 F.R.D. 330 (N.D. Cal. 2010) ................................................................................... 15

*Korolshteyn v. Costco Wholesale Corp.*,
　　2017 WL 1020391 (S.D. Cal. Mar. 16, 2017) .................................................................. 8

*Krueger v. Wyeth, Inc.*,
　　396 F. Supp. 3d 931 (S.D. Cal. 2019). ............................................................................. 7

*Lambert v. Nutraceutical Corp.*,
　　2015 WL 12655388 (C.D. Cal. Feb. 20, 2015). ............................................................... 8

*Lambert v. Nutraceutical Corp.*,
  870 F.3d 1170 (9th Cir. 2017) .......................................................................................... 6

*Morgan v. Sundance, Inc.*,
  142 S. Ct. 1708 (2022) ..................................................................................................... 5

*Nedlloyd Lines B.V. v. Superior Ct.*,
  3 Cal. 4th 459 (1992) ..................................................................................................... 14

*Nelson v. Serwold*,
  687 F.2d 278 (9th Cir. 1982) ........................................................................................... 9

*Opperman v. Path, Inc.*,
  No. 13-CV-00453-JST, 2016 WL 3844326 (N.D. Cal. July 15, 2016). ........................ 14

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) ........................................................................................... 6

*Russell v. Kohl's Dep't Stores, Inc.*,
  2015 WL 12781206  (C.D. Cal. Oct. 6, 2015) ................................................................ 7

*Sequoia Benefits & Ins. Services, LLC v. Costantini*,
  553 F. Supp. 3d 752 (N.D. Cal. 2021). ........................................................................... 5

*Spann v. J.C. Penney Corp.*,
  2015 WL 1526559 (C.D. Cal. Mar. 23, 2015) ................................................................ 7

*Stathakos v. Columbia Sportswear Co.*,
  2017 WL 1957063 (N.D. Cal. May 11, 2017). ............................................................... 7

*Trazo v. Nestle USA, Inc.*,
  113 F. Supp. 3d 1047 (N.D. Cal. 2015) .......................................................................... 7

*Van Slyke v. Cap. One Bank*,
  503 F. Supp. 2d 1353 (N.D. Cal. 2007) ........................................................................ 14

*Wiener v. Dannon Co.*,
  255 F.R.D. 658 (z.D. Cal. 2009) ..................................................................................... 6

*Williams v. Gerber Products Co.*,
  552 F.3d 934 (9th Cir. 2008) ........................................................................................... 8

## I. INTRODUCTION

In its Opposition to Plaintiff's Motion for Class Certification, (ECF No. 206) ("Opposition"), Defendant, Zoosk, Inc. ("Zoosk") relies on a number of untimely disclosed witnesses and never before disclosed evidence to, *inter alia*, attempt to undermine Plaintiff Greenamyer's standing, as well as to suggest the requested injunctive relief has been mooted. For the reasons explained at length in Plaintiff's concomitantly filed Motion to Strike Untimely Disclosed Evidence and Witnesses ("Motion to Strike"), pursuant to Rules 26 and 37, this Court should exclude that evidence and refuse to consider it for any purpose, especially as to Plaintiff's Motion for Class Certification.[1]

Specifically, the sole evidentiary reed supporting Zoosk's standing argument—that Greenamyer's information was not impacted by the Breach—is the declaration of its parent company, Spark's, in-house counsel Juliana von Trotha. (ECF No. 206 at 10)[2] (citing ECF No. 206-9). However, in addition to having seemingly never worked for Zoosk—and thus it not being apparent how she is competent to provide such evidence, other than as a vehicle for rank hearsay—Ms. Von Trotha was *never* disclosed as a witness in this case, yet she (1) purports to provide evidence that Greenamyer is not a Class member, (2) materially adds to Zoosk's prior discovery responses with never before revealed details (including additional categories of PII impacted in the Breach), (3) attempts to sponsor a new version of Zoosk's Privacy Policy, one, conveniently, created on June 6, 2022, (weeks *after* Plaintiff's Motion was filed), and (4) asserts statistics concerning the number of page views of the Privacy Policy. *See* Motion to Strike at § II.B.3.b. Once all of this evidence is ignored—as it must be—Zoosk's corresponding arguments necessarily crumble alongside. Moreover, the facts in the record establish Greenamyer's Class membership.

Likewise, for purposes of opposing Rule 23(b)(2) certification and Plaintiff's requested injunctive relief, Zoosk relies on the declaration of Constantin Garcev, (ECF No. 206 at 29-30), a witness first disclosed on May 13, 2022—weeks after discovery in this case closed and Plaintiff's

---

[1] To the extent the Court is willing to consider Zoosk's untimely evidence—and it should not—Plaintiff requests re-opening of discovery to test the bona fides of the newly disclosed matters, followed by the ability to issue new expert reports and file a renewed class certification motion.

[2] Pinpoint citations to material previously publicly filed on the Court's docket refer to the CM/ECF system's pagination in the upper right-hand corner of the documents.

expert reports were due.[3]  Mr. Garcev avers as to all manner of cybersecurity remediation and mitigation measures Zoosk has adopted, will be adopting, or is considering adopting concerning its "security posture," but that have never before been revealed or disclosed to Plaintiffs despite multiple overlapping discovery requests that all sought that precise information. *See* Motion to Strike at § II.B.3.a. This witness and his evidence too then must be excluded and ignored, especially for purpose of this motion, and Zoosk's Rule 23(b)(2) arguments fall along with him.

Relying on its expert Mr. Ellman, Zoosk also argues that Plaintiff's damages models overstate its revenue by a very significant sum, (ECF No. 206 at 16 n.9), but it does so based upon a document, ZOOSK00002773, purportedly containing information concerning subscription fee credits/offsets that was not disclosed under Rule 26 nor produced during discovery, despite also clearly being responsive to multiple discovery requests. *See* Motion to Strike at § II.B.1. This evidence too then—and the portions of Mr. Ellman's report reliant thereupon—must be ignored.[4]

Zoosk's other class certification arguments are not well taken, as further explained below.

## II.  ARGUMENT

### A.  Plaintiff Greenamyer Has Standing

As explained in the Motion to Strike, Zoosk's witness, von Trotha, and associated evidence concerning Plaintiff Greenamyer's standing must be excluded. Stripped of that evidence, Zoosk's arguments necessarily fail.[5]

#### 1.  The Record Establishes Greenamyer's Inclusion in the Class

Zoosk's recitation of the factual recorded concerning Plaintiff Greenamyer is incomplete at

---

[3] That disclosure—untimely as it was—also failed to identify the true topics Zoosk would be using Mr. Garcev for: its various remediation and mitigation measures put in place following the Breach. *See* Motion to Strike at § II.B.3. And, while Mr. Garcev was first *mentioned* on May 13th, both of the offending declarations were first proffered when Zoosk's response was filed, on June 10th, which fell after Plaintiff's reply expert reports were due, on June 8th.

[4] The Motion to Strike also addresses certain disc images—which Zoosk had previously explained stated were destroyed, and which, still have not been produced—relied upon by Zoosk's expert Mr Halabi that Plaintiff believes must also be excluded. *See* Motion to Strike at § II.B.2. However, those matters are not referenced in the Opposition, and hence are not addressed any further herein.

[5] To the extent the Court is willing to consider this evidence and finds Ms. Greenamyer is an inappropriate class representative, Plaintiff seeks leave to amend to add additional class representative(s), two of whom proposed class counsel are currently seeking to retain.

best and misleading at worst. (ECF No. 206 at 9-10). Rather, a fulsome review of the record establishes that Ms. Greenamyer is a member of the Class and Subscription Subclass.

### a. Plaintiff Greenamyer Was a Paid Subscriber During the Breach

In October of 2015, having survived two cataclysmic life events—retirements and divorce—Plaintiff Greenamyer "went for it" and decided to become a paid subscriber of the dating website, Zoosk. (Greenamyer Depo. Tr., attached to the Grombacher Declaration in Support of Plaintiff's Reply as **Exhibit 1**, at 24:17-23; 30:3-6). Plaintiff enrolled in an automatic renewal subscription wherein she paid $29.99 per month until her account became inactive in March of 2021. (Greenamyer 36:20-25.).

At the time she initiated her subscription, Plaintiff Greenamyer reviewed Zoosk's Privacy Policy. This was important to her because, "I'm signing up for an online dating service. I want to make sure that I'm protected, because it's me." (Greenamyer 50:1-10.)[6]

Plaintiff expected for the monies she paid in her Zoosk subscription to pay for data security. (Greenamyer at 62:20-63:17; 64:4-65:16; 68:1-25). Plaintiff Greenamyer would not have signed up for service if she knew her information would not be protected. (*Id*. at 48:5-10; 74:6-18). As she explained during deposition:

> I wouldn't have gone with Zoosk if I would have known that they're not going to protect me a hundred percent of me, Tracy Greenamyer. Because I'm dating someone. I'm trying to find someone. If I would have known they weren't going to protect me I wouldn't have went with them. I would have been like no, I'm not going with them. I don't feel safe with them. Its like going in a car with a stranger. No? I want someday that going to protect me.

Greenamyer at 65:1-16.

### b. Greenamyer's Military Tenure and US Department of Veteran's Affairs Employment Instilled in Her the Importance of Privacy

After serving in the military and her more than twenty-year tenure with the US Department of Veteran's affairs, Plaintiff Greenamyer understood the importance of privacy and guarded her online privacy. Plaintiff regarded her email address as confidential. (Greenamyer 57:5-10). As she

---

[6] Indeed, in creating her account Plaintiff Greenamyer entrusted Zoosk with a significant amount of information of various level of confidentiality—name, birthday, gender preference, race or ethnicity, and gender. (Greenamyer 45:11-46:9.)

explained, "If I give my e-mail information, then I'm, you know, giving it to – it's like giving my mailing address.  I consider the e-mail address like your home address." (Greenamyer at 57:22-58:5). With the exception of her LinkedIn account, Plaintiff's social media accounts were not generally accessible to the public. To her best recollection, Plaintiff has never been the victim of identify theft and has never noticed any fraudulent charges on any bank account or credit card. (Greenamyer 56:5-13).

### c. Plaintiff was Subject to Repeated Security Breaches While a Subscriber of Zoosk

In May of 2021, Plaintiff attempted to log into her Zoosk account and discovered that her profile had been removed. (Greenamyer 42:19-24). Plaintiff received a message from Zoosk informing her that "Recent activity may have affected your account security.  So we've blocked it." GREENAMYER000004 **Composite Exhibit 2** attached to the Grombacher Declaration in Support of Administrative Motion to Seal (Dkt 216-1)("Seal Grombacher Decl.").  After discovery this security incident, Plaintiff took several remedial measures to protect herself including installing two-factor authentication on her Zoosk registered email address and purchasing insurance that included credit monitoring services. (Greenamyer at 17:16-25). Plaintiff utilized the credit services to run a check on her data and discovered that her Zoosk registered email address was first identified as being on the dark web in the months following the Zoosk data breach.[7] (Greenamyer at 72:19-23; 73:17-74:5; and GREENAMYER000027-29, attached hereto as **Composite Exhibit 2**).

### d. Greenamyer Has Acted Admirably In her Role as Putative Class Representative

To date, Plaintiff Greenamyer has taken her duties and responsibilities as a putative class representative seriously.  She has dedicated significant time and resources to this matter including: searching for and producing documents; calling third parties for information including Apple and Navy Federal Credit Union, Plaintiff's banking instruction; making in-person attempts at Navy

---

[7] Plaintiff "doesn't recall" whether she received an email from Zoosk in or around June 2020 advising her of the breach. Greenamyer 52:23-24 ("I don't recall at the time because I was deleting a bunch of messages. So I'm not sure if I got that or not.").

Federal to obtain responsive documents; reviewing documents; responding to written interrogatories; reviewing the complaint and authorizing the document to be filed with the Court; and attending telephonic calls with counsel.[8]

### 2. Zoosk Waived Enforcement of Any Class Action Waiver Clause

Zoosk's argument that Plaintiff waived her ability to act as a class representative via agreement to its Terms of Use, (ECF No. 206 at 10-12), is meritless. Each of the plaintiffs at issue in this case were subject to the same or similar clauses. Yet, Zoosk has litigated this case for nearly two years without raising this issue, despite class allegations having been at stake from its commencement, (ECF No. 1), and despite having stipulated, repeatedly, to multiple class certification schedules and extensions thereof, without ever raising this issue (until now). *See, e.g.*, (ECF No. 57 at 13; ECF No. 103; ECF Nos. 136–138; ECF No. 190; ECF No. 196).  Nor did Zoosk raise this issue in response to Ms. Greenamyer being added as a named plaintiff, despite extensive proceedings surrounding that issue. *See, e.g.*, ECF Nos. 129, 139, 145, 149, 150, 162, 179.[9]

Thus, much like its discovery conduct in this case, Zoosk has chosen to employ hide-the-ball tactics here too. Indeed, Zoosk waited until *after* all fact discovery, all expert reports, and Plaintiff's class certification motion was filed to raise this issue. This Court has found, under lesser circumstances, that such contractual rights are waived. *See, e.g.*, *Sequoia Benefits & Ins. Services, LLC v. Costantini*, 553 F. Supp. 3d 752, 762 (N.D. Cal. 2021). It should find likewise here.

In fact, the United States Supreme Court recently reaffirmed similar contractual waiver principles via litigation conduct in the arbitration context in *Morgan v. Sundance, Inc*., 142 S. Ct. 1708 (2022). There, the Court noted:

> Waiver, we have said, is the intentional relinquishment or abandonment of a known right. To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right; the court seldom considers the effects of those actions on the opposing party. That analysis applies to the waiver of a contractual right, as

---

[8] Greenamyer 11:16-20; 14:11-15:18; 13:22-14:2; 19:6-20.

[9] As noted in the Motion to Strike, given the procedural history surrounding Ms. Greenamyer's inclusion, good faith and candidness with the Court would have dictated that Zoosk raise the potential futility of Ms. Greenamyer as plaintiff in this case—both from a standing and class action waiver perspective—when she was added, and certainly long before now.

of any other.

*Id.* at 1713 (cleaned up). Here, Zoosk certainly intentionally relinquished or abandoned any class action waiver contractual argument by failing to assert it for nearly two years.

### B. The Court Should Certify a Rule 23(B)(3) Class

#### 1. Plaintiff's Damages Models are Proper

##### a. Zoosk Attempts to Apply the Wrong Standard

To begin with, Zoosk attempts to impose an impermissibly exacting standard of proof that simply does not exist at this juncture. The Ninth Circuit has "repeatedly emphasized that uncertain damage calculations should not defeat [class] certification." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd and remanded on other grounds,* 139 S. Ct. 710 (2019). "Uncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Id.* (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 970 (9th Cir. 2013)). "[T]he fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (quoting *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1999)). This is especially true in the context of a class claim under California's UCL: "Class wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving." *Lambert*, 870 F.3d at 1182. That is because California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Pulaski*, 802 F.3d at 989 (quoting *Marsu*, 185 F.3d at 938–39). And because under California law restitution "damages may be computed even if the result reached is approximation," "uncertain damages should not prevent class certification."[10] This Court, therefore, has "very broad discretion" to determine and fashion damages in this case. *Wiener v. Dannon Co.*, 255 F.R.D. 658, 670 (C.D. Cal. 2009) (interpreting analogous CLRA) (quoted by *Lambert*, 870 F.3d at 1183)).

---

[10] *Lambert*, 870 F.3d at 1183 (quoting *GHK Assocs. v. Mayer Grp., Inc.*, 224 Cal.App.3d 856, 274 Cal.Rptr. 168, 179 (1990); *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.*, 191 Cal.App.3d 1341, 235 Cal.Rptr. 228, 237 (1987)).

Zoosk's fundamental premise in attacking Plaintiffs' damage models is that all three fail to account for any benefit that Plaintiff received from its service. Contrary to Zoosk's assertions, Plaintiff need not establish that Zoosk's service was worthless to receive restitution amounting to a full refund (Calculation 1) or a refund of Defendant's profits (Calculation 2). *Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 952 (S.D. Cal. 2019). Plaintiff need not even contend that Zoosk's service was "valueless or worthless." *Id.* at 951. Plaintiff instead need only contend that "she would not have purchased [Defendant's product], despite its benefits, had it been marketed correctly."[11] In that circumstance, the issue becomes "whether a reasonable consumer would have purchased [Zoosk's] products had she known all the information and whether [Zoosk's] alleged misrepresentations and omissions were a determining factor in Plaintiff's decision to purchase." *Krueger*, 396 F. Supp. 3d at 953-54. The factfinder ultimately decides that question, and if the answer is "no," then Plaintiff is entitled to a "full refund" as an appropriate remedy under the UCL. *Id.*; *Russell*, 2015 WL 12781206, at *3; *Spann,* 2015 WL 1526559, at *3.

In insisting that Plaintiff is bound by the benefit of her bargain, minus any value she derived from her use of Zoosk's service, Zoosk glosses over the unique facts of this case and attempts to equate this case to run-of-the-mill product mislabeling case. *See, e.g. In re Pom Wonderful LLC*, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014) (product). In those circumstances, the measure of damages must account for any benefit that the consumer derived from the product or service, lest the action yield a boon or windfall to the consumer.[12]

But the facts underpinning this action are not ordinary, and Plaintiff's damages models for purposes of class certification—unlike anything proposed or suggested by Defendant—properly

---

[11] *Id.* at 952 (distinguishing *Pom* and adopting analysis in *Russell v. Kohl's Dep't Stores, Inc.*, 2015 WL 12781206, at *3 (C.D. Cal. Oct. 6, 2015) and *Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *3 (C.D. Cal. Mar. 23, 2015)).

[12] *See In re POM Wonderful LLC*, 2014 WL 1225184, at *3; *Trazo v. Nestle USA, Inc.*, 113 F. Supp. 3d 1047, 1052 (N.D. Cal. 2015) ("The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received, not the full purchase price or all profits. There is no reason to go beyond the price premium, and doing so would result in a windfall to plaintiff." (citation omitted)); *Stathakos v. Columbia Sportswear Co.*, 2017 WL 1957063, at *9–13 (N.D. Cal. May 11, 2017).

7

account for that difference.  Plaintiff in this case clearly and unequivocally testified that, had she known about Defendant's lax data security, she would not have signed up to use Defendant's dating service. Period. *See infra* § II.A.1.a. And Mr. Olsen's Calculations 1 and 2 properly account for that. As this Court noted on a couple of occasions, "[d]ating sites implicate data about users' romantic lives and sexual preferences, which are particularly reputationally sensitive." (ECF Nos. 133 at 7; 61 at 6).  As a result, as this Court found, for Zoosk's customers, like Plaintiff, "customers' privacy featured 'central[y] in the service's function . . . ." (Dkt. No. 133 at 7).

In that fundamental sense, this case differs from those involving products like food or televisions, which, although not performing as advertised, nevertheless undeniably afford value to the consumer.  In those cases, the consumer "value[s] a variety of factors when choosing which [product] to buy," none of which can be plausibly asserted was central to the consumer's purchasing decision giving rise to the action.[13]  With food and televisions, the consumer "know[s] generally the purpose of food and the function of a TV without reading a description on the label." *Korolshteyn*, 2017 WL 1020391, at *7   On the other hand, a consumer buying an herbal ginkgo supplement, for instance, looks directly to the key ingredient (gingko), which, if not present as advertised by the defendant, effectively nullifies the consumer's purchase, and the consumer is entitled to a full refund.  *Korolshteyn*, 2017 WL 1020391, at *7; *Lambert v. Nutraceutical Corp.*, 2015 WL 12655388, at *4 (C.D. Cal. Feb. 20, 2015).  Thus, if restitution under the UCL is based on "a purchaser would have paid at the time of purchase had the purchaser received all the information," and if the answer to that is zero because the purchaser would simply not have purchased the service, then the damage awardable is a full refund.  *Pulaski*, 802 F.3d at 988.

The record shows that it is at least plausible that—given the particularly sensitive nature of the data at issue, and knowing Zoosk's abject failure to secure it—the objective consumer, like Plaintiff, would not have chosen Defendant's services. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008). "If the finder of fact finds that [Defendant's services] is in fact valueless

---

[13] *See Korolshteyn v. Costco Wholesale Corp.*, 2017 WL 1020391, at *7 (S.D. Cal. Mar. 16, 2017) (citing *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.*, 2016 WL 5920345, at *7 (C.D. Cal. Jun. 23, 2016)); *see also In re Pom*, 2014 WL 1225184, at *3.

8

then that justifies fully refunding the class for their purchases." *Lambert*, 2015 WL 12655388, at *4. And for that same reason, the full refund damages models (Categories 1 and 2) "match the theory of liability." *Capaci v. Sports Rsch. Corp.*, 2022 WL 1133818, at *17 (C.D. Cal. Apr. 14, 2022). In any event, California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Pulaski*, 802 F.3d at 989 (quoting *Marsu*, 185 F.3d at 938–39). In this way, the Calculations 1 and 2 damages theories acquits the twin purposes of restitution: "to restore the defrauded party to the position he would have had absent the fraud," and "to deny the fraudulent party any benefits, whether or not foreseeable, which derive from his wrongful act." *Nelson v. Serwold*, 687 F.2d 278, 281 (9th Cir. 1982) (citing the Restatement of Restitution). Plaintiff satisfies her burden with respect to Calculations 1 and 2.

### b. Calculation 3 Addresses Zoosk's Arguments

In any event, the Calculation 3 damage model supplies the very evidentiary support that Zoosk claims is lacking from Calculations 1 and 3. "Under the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest." *Pom Wonderful*, 2009 WL 5184422, *2 (internal quotation marks omitted) (quoted by *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 986 (N.D. Cal. 2016)). "[R]estitution is the return of the excess of what the plaintiff gave the defendant over the value of what the plaintiff received." *Pulaski*, 802 F.3d at 988. Stated otherwise, under the UCL, restitution "is based on what a purchase would have paid at the time of purchase." *Id.* The Calculation 3 damage model does just that, although perhaps differently than how Zoosk would like. But Zoosk cannot plausibly argue that this model comprises a nonrestitutionary disgorgement, a full refund, or a calculation that otherwise would result in a windfall to Plaintiff and the Class. *See In re POM*, 2014 WL 1225184, at *3; *Trazo*, 113 F. Supp. 3d 1047 at 1052. This damage model measures the total additional amount of money from the Subscription Subclass's subscription fees that Zoosk should have spent on providing Plaintiff and the Subclass with the adequate data security measures and protocols that Plaintiff and the Subclass

expected,[14] and it is tied directly to Plaintiff's unmet expectations and to the theory of liability in this case. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (plaintiff must show that damages stemmed from defendant's actions that created legal liability). The damages model affords a "reasonable basis of computation of damages" that calculates the benefit-of-the-bargain theory that Zoosk presses here. *Lambert*, 870 F.3d at 1183; *Comcast*, 569 U.S. at 35.

Per Zoosk's argument in the specific context of data breach, "the theory of benefit of the bargain restitutionary damages is that the defendant's UCL violation denied the plaintiff data security to which she was entitled and thus allows the plaintiff to recover restitutionary damages equal to the difference between the amount she paid for data security and the value of the data security she actually received." (ECF No. 206 at 13). But that is exactly what Calculation 3 seeks to establish: what Plaintiff or any Subclass member each paid for Zoosk's service is easily determined and easily subject to class-wide proof. On the second point, the value of what Plaintiff and the Subclass actually received, Calculation 3 reasonably attempts to measure that amount by looking to the extra profit Defendant made on the subscription fees at issue by not using it to provide consumers the data security they reasonably expected.[15]

*In re Marriott* affords an especially analogous example. There, the defendant, a hotel chain, experienced a data breach in which the hackers gained access to the PII of the plaintiffs, the hotel guests. 2022 WL 1396522, at *2. On class certification of their UCL claim, the plaintiffs, like here, relied on an "overpayment" theory of damages by which "Marriott was able to charge higher prices for hotel rooms than they would have in a hypothetical 'but-for' world in which consumer willingness to pay for a hotel room had shifted in response to consumer knowledge of [Marriott's] inadequate data security; consequently, named plaintiffs overpaid for their respective hotel stays as a result of Marriott's alleged data security failures." *Id.* at *24. As here, the plaintiffs' expert attempted to approximate "the amount that class members overpaid pursuant to that theory." *Id.*

---

[14] *See* (ECF No. 201-10, Olsen Report at ¶¶ 19-23).
[15] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 2022 WL 1396522, at *23 (D. Md. May 3, 2022); *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 990 (N.D. Cal. 2016).

10

To do so, the expert devised a complex model that required input of data comprising "(1) personal data of an administrative nature that is in Defendants' [customer] database, including the exact Starwood hotel at which a class member stayed, the price paid for that hotel stay, and the date(s) of that stay, and (2) verifiable market data information such as historical prices and hotel attributes that [the plaintiff's expert] has demonstrated are available." *Id.* at 7, 24.  Against objection by the defendant to the proposed damage model on the question of predominance, the court certified the class, finding that the expert's model was consistent with the plaintiff's overpayment theory of harm and that—despite its complexity, "myriad variables," and over-inclusiveness—the model adequately estimated the plaintiffs' harm under the UCL for purposes of class treatment. *Id.* at 24.

Like the damages model in *In re Marriott*, the Calculation 3 damages model necessarily examines a "hypothetical 'but-for'" scenario that attempts to mimic, or at least reasonably estimate, something that simply did not occur, is not a historical fact, and can only be theorized: the amount that Plaintiff and the Subclass would have paid for Zoosk's services had they known about its inadequate data security, and, consequently, the amount they overpaid Zoosk for its service.  *Id.* (quoting *Earl v. Boeing Co.*, 339 F.R.D. 391, 428 (E.D. Tex. 2021) ("[W]here the fact of injury depends on answering what would have happened had something in the past never occurred, demonstrating injury becomes impracticable outside of a 'but-for' world.")).

And as in *In re Marriott*, the proposed damages model here rightfully does not depend on class members' individualized lay opinions on the matter; as in *In re Marriott* the model here relies on expert opinion that in turn looks to information that resides with the Zoosk, not the putative class members.  *Id.*  The goal here is to reasonably approximate an unknown value that is perforce a hypothesis—necessarily only an estimate of Plaintiff's "overpayment." Calculation 3 accomplishes that. The fact that the model relies on financial information solely in the custody of Zoosk is inconsequential.[16]  And the fact that the model definitively does not depend on

---

[16] Importantly, while Zoosk criticizes Plaintiff at length for not crediting amounts it did (or may have) spent on data security (ECF No. 206 at 18-19), that is entirely Zoosk's own fault and the product of its discovery misconduct here. Plaintiff sought, repeatedly, to have Zoosk identify precisely that kind of information. For example, Plaintiff issued Interrogatory No. 16 seeking, "how much You budgeted and how much You actually spent on data security for each year during the

11

1  individualized inquiries, such as the specific facts and opinions of each class member, only supports
2  predominance and class treatment. And even on this model, Zoosk persists with arguments
3  illustrating a "damned if you do, damned if you don't" approach implying that a calculation of an
4  overcharge damage is simply impossible. "Reading Defendants arguments regarding
5  individualized inquiries, one wonders whether 'Defendants are essentially arguing that due to the
6  [dating-service] market's nature and the myriad variables involved, determining the existence of
7  the alleged overcharge is impossible.' *Earl*, 339 F.R.D. at 428. However, "'[t]his contention cannot
8  be correct—this train of 'logic would have the effect of immunizing ... any [unlawful] ... conduct
9  concerning ... [dating-service industry]' from class treatment." *Id.* at 428–29 (citations omitted)
10 (quoted by *In re Marriott*, 2022 WL 1396522, at *24)).

11      In any event, on this record, Plaintiff adequately establishes damages "capable of
12 measurement on a classwide basis." *Comcast*, 569 U.S. at 34.  Plaintiff's damage calculation "need
13 not be exact." *Id.* at 35; *Lambert*, 870 F.3d at 1183.  By its very nature, the hypothetical inquiry at
14 issue—the value of the overcharge—will undoubtedly yield inexact estimates of the Subclass
15 members' monetary damages irrespective of the underlying methodology. Further, Plaintiff's
16 damage model seeks to measure the amount that Plaintiff and the putative Subclass overpaid for
17 the services Zoosk provided them.  That measure is linked directly to the theory of harm Plaintiff
18 advances in her underlying UCL claim. *Comcast*, 569 U.S. at 35 ("[A]ny model supporting a
19 plaintiff's damages case must be consistent with its liability case.") (internal quotations omitted).

### 2.      Individual Reliance Issues Do Not Prelude Certification

Plaintiff previously explained at length why reliance was not a hurdle to Rule 23(b)(3) class

---

Relevant Period." Zoosk's sworn response states, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ When the deposition testimony of Benjamin Hoskins directly contradicted that sworn assertion, Plaintiff threatened to compel. *See* Plaintiff's Counsel's Letter of March 21, 2022, at § I, attached to Seal Grombacher Decl. as **Exhibit 3** (emphasis added). Zoosk's counsel responded that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See* Defense Counsel Letter of April 1, 2022, at 1, attached to Seal Grombacher Decl as **Exhibit 4** (emphasis added). To criticize Plaintiff for not accounting for information Zoosk expressly and repeatedly represented ***did not exist*** is the height of hypocrisy and emblematic of Zoosk's ongoing conduct in this case.

certification here and incorporates them by refence here. *See* (ECF No. 200-1 at 22-25). Likewise, as explained above and in the Motion to Strike, Zoosk's attempted reliance on a new Privacy Policy (from June 6, 2022) and statistics concerning webpage view of its Privacy Policy (from June 1 – 8, 2022)—both of which occurred after the close of discovery in this case (on April 29th) and after the class certification motion was filed (on May 20th)—as supported by the von Trotha Declaration, (ECF No. 260 at 26), must also be excluded and ignored. *See* Motion to Strike at § II.B.3.b.

### C. The Court Should Certify Rule 23(b)(2)

Zoosk's Rule 23(b)(2) arguments are also infirm. ***First***, as explained, Zoosk's evidence concerning Plaintiff Greenamyer's inclusion in the Class must be excluded, and the other evidence in the record establishes that she is a Class and Subclass member. ***Second***, it is established that Zoosk maintains the PII of its users for years (in some case more than decade) after their last log-in. *See* (ECF No. 200-1 at 14). Thus, Zoosk keeps Plaintiff's and Class Members' PII regardless of whether they continue to use or pay for its services, and its inadequate data security practices puts that PII at risk of being stolen again. In an analogous setting in *Adkins v. Facebook, Inc*., 424 F. Supp. 3d 686, 698 (N.D. Cal. 2019), this Court found standing and (b)(2) certification appropriate.

Finally, Zoosk's negligence-specific arguments, (ECF No. 206 at 29-30), are inapt. As noted in section II.A.1.c, Plaintiff has experienced identity-fraud and related damages from this Breach: she discovered that her Zoosk registered email address was first identified as being on the Dark Web in the months following the Breach, she installed two-factor authentication on that email address due to this issues at play here, and she purchased insurance that included credit monitoring services because of it.  While such damages are not being sought on behalf of the Class here under Rule 23(b)(3), that does not preclude the negligence claim as a viable vehicle for Rule 23(b)(2) certification and Zoosk points to no authority to the contrary. Her PII remains at risk of misuse.[17]

### D. Certification under Rule 23(c)(4) Would Be Appropriate

Zoosk's standing arguments fall flat for purposes of Rule 23(c)(4) certification for the same reasons as explained above. Moreover, issue certification would materially advance this matter, for

---

[17] Zoosk's injunctive relief arguments must be ignored. *See* Motion to Strike § II.B.3 & II.B.3.a.

the reasons articulated in the motion and in *In re Marriott*, 2022 WL 1396522, at *31.

### E. A Nationwide Class Can be Certified

Contrary to Zoosk's assertions,[18] "California law sets forth *two* different choice of law tests" to determine whether California law will be applied to a nationwide class. *Opperman v. Path, Inc.*, No. 13-CV-00453-JST, 2016 WL 3844326, at *6 (N.D. Cal. July 15, 2016). The court first asks if "the parties have an agreement that another jurisdiction's law will govern their disputes," in which case, the court solely "addresses the enforceability of [the] contractual choice-of-law provisions." *Id.* at *7 (quoting *Washington Mutual Bank, FA v. Superior Court*, 24 Cal. 4th 906, 914–15 (2001)). If no such provision exists, the court then analyzes "the governmental interests of the various jurisdictions involved to select the most appropriate law." *Id.*

Here, the first test applies as a choice of law provision exists where all disputes arising from the "Agreement shall be governed by the internal substantive laws of the State of California, without respect to its conflict of laws principles." *See* Zoosk's Terms of Service ¶ 20(a) (September 7, 2016 revision).[19] And because Zoosk does not argue that this choice of law provision is unenforceable, the Court must deem the provision valid. *See, e.g.*, *Id.* at *7 (court deemed enforceability argument waived where neither "Apple nor Path argue[d] that its choice of law provision, if it applies, is unenforceable").[20] Accordingly, California law must apply to the nationwide class.[21]

---

[18] Zoosk misconstrues this Court's statement that it "might" hold California law applies nationwide if there is a California choice of law provision (ECF 141 at 10:6-20) to mean it will *only* find California law applies nationwide if there is such a provision, (ECF No. 206 at 31). This Court, to the contrary, has applied California law nationwide even when there was no California choice of law provision, but a Virginia one. *See Van Slyke v. Cap. One Bank*, 503 F. Supp. 2d 1353, 1362 (N.D. Cal. 2007) (finding that "California law, and not Virginia law applies" to nationwide class). Zoosk's reliance on *Rodriguez v. Instagram, LLC* is misplaced as it was decided at the motion to dismiss stage and stated only that absent a choice of law provision, the application of contract law for all 50 states would "likely" be necessary. 2013 WL 3732883, at *3 (N.D. Cal. July 15, 2013).

[19] *See also Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 470 (1992) (holding "a valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement") (cited by *Gen. Signal Corp. v. MCI Telecommunications Corp.*, 66 F.3d 1500, 1506 (9th Cir. 1995)).

[20] Further, because the enforceability analysis hinges on "whether the chosen state's law is contrary to a fundamental policy of California" (503 F. Supp. 2d 1353 at 1360), this analysis is largely inapplicable when applying a California choice of law provision in California.

[21] *See, e.g.*, *Dickey v. Advanced Micro Devices, Inc.*, 2016 WL 6427852, at *4, *6 (N.D. Cal. Oct.

Nevertheless, were the Court to find that it needs to apply the "governmental interest" test (it does not), the Court would still find that California law should apply to the nationwide class. To satisfy the governmental interest tests and due process principles, "the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Opperman*, 2016 WL 3844326, at *8 (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589–90 (9th Cir. 2012). "Once the class action proponent makes this showing, the burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Id*. To prove that the interests of a foreign state outweigh California's interest, the defendant must show that: (1) the potentially concerned foreign states have different laws; (2) each potentially concerned foreign state has an interest in having its law applied to the case; and (3) the potentially concerned foreign states' interests would be more impaired if its policy were subordinated to the policy of California. *Id*. Zoosk carries the burden of proving these three elements with "case-specific analysis."[22]

Here, because at the time of the Breach Zoosk was incorporated and headquartered in California, its principal place of business was in California, and the final decisions regarding representations made on data security were made in California, Plaintiff has shown California has sufficient contacts to the claims of each class member.[23] Zoosk, however, has completely failed to carry its burden, failing to detail any "case-specific" evidence to support any of the three prongs of the "governmental interest" test.[24] Accordingly, California law applies to the nationwide class.[25]

---

31, 2016) (declining to dismiss California consumer protection claims of nationwide class where choice of law provision stated that any "claim relating to the Materials shall be governed by the internal substantive laws of the State of California"); *Opperman*, 2016 WL 3844326, at *8 (holding "that Apple's choice of law provision requires the application of California law" nationwide)

[22] *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 658 (C.D. Cal. 2014).

[23] *See Clay v. CytoSport, Inc.*, 2018 WL 4283032, at *14 (S.D. Cal. Sept. 7, 2018) (sufficient contacts existed where it was "undisputed that Defendant is incorporated and headquartered in California, its principal place of business is in California, [and] the final decisions regarding representations made… were made in California")

[24] *See, e.g.*, *Clay*, 2018 WL 4283032, at *17 (holding that applying UCL nationwide did not impede other states in applying their policies where "defendant pointed to no state with a greater interest in enforcing its laws"); *Keilholtz v. Lennox Hearth Prod. Inc.*, 268 F.R.D. 330, 341-42 (N.D. Cal. 2010) (applying California law nationwide where defendants did not meet "burden of showing that the differences between California law and that of the other jurisdictions [were] material"); *Allen*, 300 F.R.D. 643 at 658 (where defendants failed "to provide any case-specific analysis addressing" the three prongs and only "conclusorily assert that the laws of the 50 states are 'markedly different,'" court held California substantive law applied to nationwide class)

[25] Zoosk also cites *In re Sony Gaming* and *Frenzel v. AliphCom* to argue that the choice of law here

Dated: June 24, 2022                    Respectfully submitted,

**BRADLEY/GROMBACHER, LLP**
**CROSNER LEGAL P.C**
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**

By: /s/    John Yanchunis
Marcus J. Bradley, Esq.
Kiley L. Grombacher, Esq.
Lirit A. King, Esq.
Zachary M. Crosner
Michael R. Crosner
John A. Yanchunis
Ryan McGee
*Attorneys for Plaintiffs*

---

applies only to the construction of the agreement and not to tort claims arising from the agreement. Apart from the Supreme Court of California deciding the exact opposite in *Nedlloyd*, the facts of those two cases are inapposite. *See In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 965 (S.D. Cal. 2012) (provision specifically stated that California law applies only "to the construction and interpretation of the contract"); *Frenzel v. AliphCom*, 76 F. Supp. 3d 999, 1009 (N.D. Cal. 2014) (terms of use unapplicable to claims arising from sale of product where terms of use stated that it applied only to the "use of [the] website" not "the purchase of any product or service").

16